## RAILROAD COMMISSION OF WISCONSIN ET AL. *v.* CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

No. 206. Argued March 11, 14, 15, 1921; restored to docket for reargument October 24, 1921; reargued December 5, 6, 7, 1921.— Decided February 27, 1922.

1. An order of the Interstate Commerce Commission requiring a horizontal increase of intrastate passenger fares and excess baggage charges, to correspond with fares and charges fixed for like interstate service in the same State, can not be sustained, under § 13 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, as an order to remove undue and unreasonable prejudice to persons traveling in interstate commerce, when it broadly embraces not only the intrastate rates to and from border points, which may work discrimination against interstate passengers and localities, but also those between points more remotely internal from which no such prejudice can arise upon the facts found by the Commission. P. 579. *The Shreveport Case*, 234 U. S. 342, and *Illinois Central R. R. Co.* v. *Public Utilities Commission*, 245 U. S. 493, distinguished.

2. Such an order is not validated by a clause saving the right of the State, or other party in interest, to apply to the Commission for a modification as to particular intrastate fares or charges. P. 580.

3. The Transportation Act of 1920, § 422, (§ 15a), provides in part that the Commission, in the exercise of its power to prescribe just and reasonable rates, shall initiate, modify, establish or adjust such rates so that carriers as a whole, or in groups or territories designated by the Commission, will earn an aggregate net income equal to a fair return on the aggregate value of their railway property held and used for transportation; that the Commission shall determine what percentage of such aggregate property value constitutes a fair return and such percentage shall be uniform for the groups or territories; and that in making such determination it shall give due consideration to the transportation needs of the country and the necessity of enlarging transportation facilities in order to provide the people of the United States with adequate transportation.

*Held:* (*a*) The effective operation of the Transportation Act reasonably requires that intrastate traffic over the lines of interstate carriers pay a fair proportionate share of the cost of maintaining an adequate railway system. P. 585.

(*b*) While § 15a, *supra,* confers no power on the Commission to deal with intrastate rates, § 416, (§ 13, par. 4,) of the same act, in authorizing it to remove and in forbidding and declaring unlawful, " any undue, unreasonable, or unjust discrimination against interstate or foreign commerce," clearly contemplates that such discrimination, resulting from intrastate rates unduly low as compared with interstate rates as fixed under § 15a, and tending to thwart the purpose of that section, may be removed by the Commission. P. 586.

(*c*) The act being clear on this point, reports and debates of Congress can not be resorted to to introduce ambiguity. P. 588.

(*d*) The valuation required by § 15a is not confined to that part of the property of the interstate carrier used in interstate, segregated from that used in intrastate, commerce. P. 587.

(*e*) Raising the level of the intrastate rates in such case, is an incident to the effective control of the interstate system, and does not violate the proviso against the Commission's regulating traffic wholly within a State. P. 588.

(*f*) The act as so applied is within the power of Congress over interstate commerce. P. 589.

(*g*) The action of the Commission under it, respecting intrastate rates, should be directed to substantial disparity which operates as a real discrimination against and obstruction to interstate commerce, leaving state authorities to deal with intrastate rates *inter sese* on the general level found fair by the Commission. P. 590.

Affirmed.

THE proceeding out of which this case has grown, known as the Wisconsin Passenger Fares, began in an investigation by the Interstate Commerce Commission, under paragraphs 3 and 4 of § 13 of the Interstate Commerce Act as amended by § 416 of the Transportation Act of 1920 (41 Stat. 484), into alleged undue and unreasonable discrimination against interstate commerce arising out of intrastate railroad rates in Wisconsin. The interstate carriers by steam railroad of the State were

made respondents, and the Governor and State Railroad Commission were duly notified. The Interstate Commerce Commission made its report and order November 27, 1920. *Wisconsin Passenger Fares,* 59 I. C. C. 391.

The Commission had investigated the interstate rates of carriers in the United States, in a proceeding known as *Ex parte 74, Increased Rates,* 58 I. C. C. 220, for the purpose of complying with § 15a of the Interstate Commerce Act as amended by § 422 of the Transportation Act of 1920 (41 Stat. 488). That section requires that the Commission so adjust rates that the revenues of the carriers shall enable them as a whole or by groups to earn a fixed net income on their railway property. The Commission ordered an increase for the carriers in the group of which the Wisconsin carriers were a part, of thirty-five per cent. in interstate freight rates, and twenty per cent. in interstate passenger fares and excess baggage charges, and a surcharge upon passengers in sleeping cars amounting to fifty per cent. of the charge for space in such cars to accrue to the rail carriers. Thereupon the carriers applied to the Wisconsin Railroad Commission for corresponding increases in intrastate rates. The state commission granted increases in intrastate freight rates of thirty-five per cent., but denied any in intrastate passenger fares and charges on the sole ground that a state statute prescribed a maximum for passengers of 2 cents a mile.

In the *Wisconsin Passenger Fares,* the Interstate Commerce Commission found that all of the respondent carriers of Wisconsin transported both intrastate and interstate passengers on the same train, with the same service and accommodations; that the state passenger paying the lower rate rode on the same train, in the same car, and perhaps in the same seat with the interstate passenger who paid the higher rate; that the circumstances and conditions were substantially similar for interstate as for intrastate passenger service in Wisconsin; that travelers des-

tined to, or coming from, points outside the State found it cheaper to pay the intrastate fare within Wisconsin and the interstate fare beyond the border than to pay the through interstate fare; that undue preference and prejudice were shown by the falling off of sales of tickets from border line points in Minnesota and Michigan to stations in Wisconsin, and by a marked increase in sales of local tickets from corresponding border line points in Wisconsin to stations in Wisconsin; that the evidence as to the practice with respect to passenger fares applied in like manner to the surcharge upon passengers in sleeping and parlor cars and to excess baggage charges.

The Commission further found that the fare necessary to fulfill the requirement as to net income of this interstate railroad group under § 15a was 3.6 cents per mile, and that this was reasonable, that the direct revenue loss to the Wisconsin carriers, due to their failure to secure the 20 per cent. increase in intrastate fares, would approximate $2,400,000 per year if the 3-cent fare fixed by the President under federal war control, were continued, and $6,000,000 per year if the 2-cent fare named in the state statute, should become effective.

The Commission found that there was undue, unreasonable and unjust discrimination against persons travelling in interstate commerce and against interstate commerce as a whole; and ordered that the undue discrimination should be removed by increases in all intrastate passenger fares and excess baggage charges and by surcharges corresponding with the increases and surcharges ordered in interstate business.

The order was made without prejudice to the right of the authorities of the State or of any other party in interest to apply in the proper manner for a modification of the order as to any specified intrastate fares or charges if the latter were not related to the interstate fares or charges in such a way as to contravene the provisions of the Interstate Commerce Act.

The carriers filed bills in equity, of which the present is one, in the District Court to enjoin the State Railroad Commission and other state officials from interfering with the maintenance of the fares thus ordered and published.

Application for interlocutory injunction was made to the District Court under § 266 of the Judicial Code. After a hearing before three judges, they granted an interlocutory injunction from which this appeal was taken.

*Mr. M. B. Olbrich,* with whom *Mr. William J. Morgan,* Attorney General of the State of Wisconsin, *Mr. Ralph M. Hoyt* and *Mr. E. E. Brossard* were on the briefs, for appellants.

No unjust discrimination, *American Express Co.* v. *Caldwell,* 244 U. S. 617, 624; *Interstate Commerce Commission* v. *Northern Pacific Ry. Co.,* 216 U. S. 538, 545; *Shreveport Case,* 234 U. S. 342, 355, was found by the Commission with sufficient definiteness. The avowed aim was the correction of rates deemed unreasonable because they did not correspond with the standard of production set up for the regulation of interstate commerce. This was an object beyond the Commission's power.

Even if removal of discrimination in the legal sense was one of the purposes, that purpose was so intermingled with other considerations as to make it impossible to separate the two. *Foote* v. *Maryland,* 232 U. S. 494, 503; *Pure Oil Co.* v. *Minnesota,* 248 U. S. 158, 162.

The substance of the power exercised, and not its shadow, determines the validity of the order. *Interstate Commerce Commission* v. *Illinois Central R. R. Co.,* 215 U. S. 452; *Same* v. *Union Pacific R. R. Co.,* 222 U. S. 541.

The substance of the power here sought to be exercised was power to determine the amount of passenger revenue to be received by interstate carriers from the purely internal commerce of Wisconsin.

The Transportation Act conferred no power to increase the intrastate rates to make them conform to an alleged.

standard of return prescribed by Congress. Obviously here lies the crux of the present controversy. Unless such a standard was laid down and such requirement as to contribution made, there could be no possibility of finding discrimination or burden on interstate commerce as the result of inadequate intrastate return.

When the act was passed, Congress was intent upon the restoration of state power rather than the assumption of more federal power,—the dangers of over-centralization were more threatening than any crisis of transportation. Evidence of the attitude of Congress is found not only in the history of this act but in other activities of Congress. S. 641, 66th Cong., 1st sess.; Doc. 155, 66th Cong., 1st sess.; Doc. 155, 66th Cong., 2d sess.; H. R. No. 230, 66th Cong., 1st sess. Congress was even willing to cumber the presidential exercise of the war power with a power of veto in the States over all change or increase in state rates, and this when there remained but two months of federal control.

If the time had arrived when Congress within the scope of its conceded constitutional power had decided to assert a unified control over all commerce, is it probable that it would have done so by an act entitled as was the Transportation Act, "An Act to provide for the termination of federal control"? Under an elaborate pretense of restoring state power, Congress would not have masked the intention of effectually displacing it by the construction of administrative machinery for its elimination.

But our contention goes beyond insistence upon the unlikelihood that Congress would do one thing, while it professed to do another. It is directed to the improbability that by any language or form of words it would have sought to inaugurate the plan of regulation for which the carriers argue.

The delegation of power to an administrative bureau to suspend, not the incidental effect of state law, but state

law in its entirety, is too novel, too revolutionary, a suggestion to be accepted without examination. To withdraw a subject-matter from the control of the States by the assertion of a previously unexercised exclusive federal power is a matter of commonplace. To leave a qualified control subject to displacement by mere administrative fiat is, we submit, quite a different proposition,—a step radical, if not revolutionary. It is not regulation of commerce; it is supervisory control—it is regulation—of state government by a federal administrative agency without parallel in existing law, and without precedent in American history.

Plainly possessing the competence to do so, if Congress had intended to regulate the amount of revenue arising from state rates, it seems self-evident that it would have asserted that power directly,—particularly so in view of the fact that a complete system of federal control of all state rates was actually in force, to which the States had grown accustomed after an interval of experience.

Apart from mere probability, the language employed does not permit of the construction essential to sustain the validity of the order. To make clear our position as to § 13, which deals with the removal of discrimination resulting from state action, we make no contention that there is any form of discrimination so resulting that may not be removed. We concede, further, that, if discrimination actually disclosed leads to successive orders, the entire field of state authority may conceivably be absorbed. This, of course, is subject to the elementary rule of definiteness and certainty in the finding of discrimination. It is our contention merely that no discrimination has been found.

Mere desertion of travel in interstate commerce for travel in intrastate commerce does not constitute discrimination against interstate commerce. The test, we think, in all cases, is resulting interference with interstate

commerce. Only when commerce has been obstructed or unnecessarily encumbered by state action, *Pensacola Telegrah Co.* v. *Western Union Telegraph Co.,* 96 U. S. 1, 9; *In re Debs,* 158 U. S. 564, 582; *Loewe* v. *Lawlor,* 208 U. S. 274, 293; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 346, has the action been shown to be discriminatory.

The stream of commercial intercourse is not clogged when a person re-buys a ticket at a state line—the physical movement of commerce may actually be stimulated—but above this, it is submitted that the volume of interstate commerce is not decreased, although an individual may by resort to subterfuge successfully defraud the carrier and procure interstate transportation at intrastate cost. But this matter is very largely within the control of the carrier itself.

The carrier is under no obligation to carry the passenger who has re-bought a ticket at a state line. *Missouri, K. & T. Ry. Co.* v. *Ashinger,* 63 Okla. 120; *Illinois Central R. R. Co.* v. *Holman,* 106 Miss. 449; *Chicago, R. I. & G. Ry. Co.* v. *Edwards,* 232 S. W. 356.

Discrimination does not arise from mere difference in rate level, or from inadequacy of intrastate rates, until in effect the legal conception of the two classes of commerce denominated " interstate " and " intrastate " has been abandoned. Until a common standard is established, plainly power to remove discrimination is wholly irrelevant to the issue of revenue production.

Prior to the amendment of § 13, the Commission had recognized that it possessed no power to resort to interstate commerce to make up deficiencies alleged to arise from intrastate commerce. *Cobb* v. *Northern Pacific Ry. Co.,* 20 I. C. C. 100; *Five Per Cent. Cases,* 31 I. C. C. 351; *Western Passenger Fares,* 37 I. C. C. 41. Nor are the views of counsel of eminence and standing wanting to demonstrate that the section, as finally enacted, conferred

upon the Commission no power such as claimed.   59 Cong. Rec., pt. 1, 66th Cong., 2d sess., Dec. 1, 1919—Jan. 5, 1920, 138, 142; Hearing before House Committee on Interstate and Foreign Commerce, 66th Cong., 1st sess., on H. R. 4378, pp. 21, 1036, 1037, 1077, 1078, 1080, 1230.

By § 15 Congress gave to the Commission power to fix reasonable interstate rates.   By § 15a it established a " rule of rate making "—the manner of exercising the power granted by § 15.   This rule for the exercise of power within a jurisdiction defined did not operate to enlarge the scope of the jurisdiction.   *Ex parte Siebold,* 101 U. S. 371.

If § 15a were a grant of power, there might be room for the contention carriers make.  But plainly it is not a grant, but a regulation or limitation of power.   The purpose of § 15a was set forth by the conference committee. Conference Report on H. R. 10453, 59 Cong. Rec., pt. 4, p. 3265.

Section 15a fixes the meaning of a reasonable return at a specified percentage of property values.   It further directs that such return shall be computed not upon the property of an individual road or carrier, as a separate unit, but upon the property used by all roads, the plain implication, of course, being their property used in interstate commerce.   By the use of the term "aggregate," it was merely intended to emphasize the plan of treating all property as belonging to one carrier, instead of many. There is nothing to indicate that the term was intended to have other significance than this.   59 Cong. Rec., pt. 1, p. 137.

The exercise of power over a given subject is not extended to include other matters simply because general words are employed in describing factors common to an excluded class, as well as that included within jurisdiction.   So that, were there nothing more than these two sections standing alone, it could not be urged successfully

that § 15a required the inclusion of those property values devoted to intrastate commerce.

But in addition to the proposition that all that is done pursuant to § 15a must be within the scope of what may be done under § 15, we have a direct restriction upon the meaning of § 15a. The terms of § 1 are plain. They refer to all the provisions of the act. Section 15a is one of those provisions, and we are not at liberty to assume that, speaking at page 36 of the Transportation Act, Congress had forgotten the plain declaration of its self-imposed limitation upon page 20; that "the provisions of this act shall not apply to transportation wholly within one State." We must presume that Congress thought it unnecessary to repeat this language in every separate provision, especially in view of the rule that its intention to include intrastate commerce must be "clearly manifested."

In the case of an administrative tribunal, the presumption is against the *extension* of jurisdiction. *Interstate Commerce Commission* v. *Northern Pacific Ry. Co.*, 216 U. S. 543.

The proviso renders void an order of the Commission of the nature herein challenged, not because it restrains the removal of discrimination, but because its proper application makes it impossible to find that the facts and circumstances shown constitute discrimination under the law—because it precludes a construction that Congress means unified control over commerce, removing the distinction between the two classes and making possible a legal relation between their rate productivities.

In so far as the order purports to remove prejudice and discrimination against persons or localities, it has no definite field of operation and leaves uncertain the territory and points to which it applies, and is clearly insufficient. It was entered on a different and erroneous theory.

The bill of complaint completely fails to make a *prima facie* showing that the Wisconsin statutes violate the Fourteenth Amendment.

*Mr. Bruce Scott* and *Mr. Alfred P. Thom,* with whom *Mr. Kenneth F. Burgess, Mr. R. V. Fletcher, Mr. O. W. Dynes* and *Mr. A. A. McLaughlin* were on the briefs, for appellee.

The commerce power, standing alone, is adequate to support the regulation by Congress, contained in paragraphs 3 and 4, of § 13 of the Interstate Commerce Act, of the state rates of carriers engaged in interstate commerce. The imperative need of an equitable regulation of commerce among the States was one of the most influential causes leading to the Constitution. *Cook* v. *Pennsylvania,* 97 U. S. 566; 1 McMaster's History of the American People, p. 206; Fiske, Critical Period of American History, 1783–1739, p. 144.

This function, along with those of war, peace and finance, is one of the fundamental essentials of national existence and efficiency, and by entering into the compact each State acquired the right to have these functions performed by the Federal Government. The rights acquired are not less state rights and are not less important or less sacred than those which the States reserved.

Congress, recognizing a great economic development, has provided in the Transportation Act for the consolidation of the carriers into great systems. (§ 407, par. 4.)

The problem of greatest magnitude which concerns the people of all the States in regard to these carriers, is how their continuity of service shall be preserved unobstructed, and what shall be the quality, adequacy and efficiency which their transportation facilities shall possess.

A broad and wise policy in dealing with the instrumentalities of commerce is, therefore, a matter of supreme interest to all the States.

The proposition that the national standard as to the adequacy and efficiency of the instrumentalities of interstate commerce can not be surrendered to the States'

judgment without an abdication of the power to regulate interstate commerce, is sustained in principle in *Houston East & West Texas Ry. Co.* v. *United States,* 234 U. S. 355; *Illinois Central R. R. Co.* v. *State Public Utilities Commission,* 245 U. S. 506; *American Express Co.* v. *Caldwell,* 244 U. S. 617.

The argument is essentially unsound which concedes to the National Government the power to regulate interstate rates, which are merely the terms on which interstate commerce is conducted, and denies to it the power to regulate the standard and efficiency of the instrument of interstate commerce, which constitutes the essential condition of the very existence of interstate commerce itself—for the constitutional power of regulation is " to foster and protect," as well as " to control and restrain." *Houston East & West Texas Ry. Co.* v. *United States, supra.*

The argument is likewise essentially unsound which concedes to the National Government the power to declare and remove a discrimination of a single rate made by a State against a competitive interstate rate, but denies to it the power to declare and remove a discrimination created by a body of state rates against the entire structure of interstate commerce. *Louisville Bridge Co.* v. *United States,* 242 U. S. 417; *Bridge Co.* v. *United States,* 105 U. S. 480.

The following propositions, as to the extent of the power of Congress under the commerce clause, are established beyond the reach of successful controversy by the decisions of this court: (1) The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. *California* v. *Pacific R. R. Co.,* 127 U. S. 39. (2) Although a particular business might not when considered by itself be within the implied power of Congress, if such

business is appropriate and relevant to the business of the corporation, the implied power is to be tested by the right to create the corporation and to attach to it that which is relevant, in the judgment of Congress, to make the business of the corporation successful. *First National Bank* v. *Union Trust Co.,* 244 U. S. 420; *McCulloch* v. *Maryland,* 4 Wheat. 316; *Osborn* v. *Bank,* 9 Wheat. 738. (3) The entire instrumentality of interstate commerce is within the regulating power of Congress, and when exercised the regulation is controlling and exclusive. *Minnesota Rate Cases,* 230 U. S. 399, 411; *Houston East & West Texas Ry. Co.* v. *United States,* 234 U. S. 351; *Hammer* v. *Dagenhart,* 247 U. S. 269.

Under these principles the Government itself might construct a transportation system, or acquire one already constructed, or might exercise through private individuals or private corporations its power of providing for commerce.

Whether owning and operating the instrumentality itself, or performing the function through private individuals or private corporations, it is ·competent for the Government to authorize the instrumentality of interstate commerce to engage in state commerce, and, under its power to regulate the instrumentality, to regulate all its activities and interests, so far as the public interest may require, including, if it so elect, the regulation as an original matter of the state rates of such interstate carriers.

The war power, standing alone, is adequate to sustain the validity of the power exercised by Congress with reference to the state rates of carriers engaged in interstate commerce, by paragraphs 3 and 4 of § 13 of the Interstate Commerce Act. *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135; *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146; *Cherokee Nation* v. *Kansas Ry. Co.,*

135 U. S. 641; *California* v. *Central Pacific R. R. Co.,* 127 U. S. 1.

The power to establish post offices and post roads, standing alone, is likewise adequate to sustain it. *California* v. *Central Pacific R. R. Co.,* 127 U. S. 1, 39.

The contention here made that it was the purpose of Congress to provide for the support and success of this national policy of transportation out of the revenues derived from interstate commerce alone, leaving the question of whether the several States would participate in this burden, or would leave it all to rest upon interstate commerce, cannot be accepted.

The result of this would be either that the national conception of the standard of transportation facilities must be abandoned because of dissenting state opinion, or the means of sustaining it up to the national standard be cast upon the interstate part of the carrier's services, or largely upon that and the balance on the internal commerce of those States which approved of the national standard and were willing to contribute to its support. The Transportation Act must clearly be construed as not permitting such a consequence.

Instead of finding in the Transportation Act terms which would force such a construction, we find that the purpose of Congress, as therein expressed, was directly the reverse. It is true that it did not deal with the primary jurisdiction over state rates and over interstate rates in the same way; but it did in unmistakable terms assert a jurisdiction over the ultimate and final regulation of both—over interstate rates as a matter of primary jurisdiction and over state rates as a matter of supervisory jurisdiction as defined in the act.

In § 422 (§ 15a of the Interstate Commerce Act), the Commission is required to find the aggregate value of the property of the carriers held for and used in the service of

transportation, and is not permitted to exclude any part of it because used for state transportation, or to make any distinction between that which is used in state service and that which is used in interstate service.

Likewise, when it comes to the question of the "fair return" prescribed by the act, no exclusion is permitted of the revenues derived from state traffic, but the return which must be provided is required to come from all traffic, state and interstate.

The contention insistently made that a different result must follow from the proviso that the act shall not apply to transportation wholly within one State, is unsound for two reasons.   (1) The clause was in express terms a part of § 1 of the Interstate Commerce Act as it stood prior to the Transportation Act, and was a part of that act at the time of the decision in *Houston, East & West Texas Ry. Co.* v. *United States,* 234 U. S. 342.   (2) The view that the clause referred to must be construed as an exclusion by Congress of jurisdiction of the Commission over the question of discrimination of state rates against interstate or foreign commerce, is plainly answered by the fact that in § 416 of the Transportation Act (paragraphs 3 and 4 of § 13 of the Interstate Commerce Act), Congress in express terms extends the power of the Commission over such discriminations. Congress, out of deference to the States, adopted the policy of dealing directly and primarily with interstate charges and of leaving the state rates to be dealt with primarily by the States, asserting a supervisory and corrective authority over state action only in cases of discrimination against interstate commerce.   But, in the final result, it unmistakably undertook, in the act, to deal ultimately with both classes of rates.   *Illinois Central R. R. Co.* v. *State Public Utilities Commission,* 245 U. S. 507.

*Mr. John E. Benton,* by leave of court, on behalf of forty-five States, as represented by their attorneys general and other counsel and by their railway and public service and utilities commissions, as *amicus curiæ. Mr. A. E. Helm* and *Mr. Karl Knox Gartner* were also on the briefs.

*Mr. P. J. Farrell,* by leave of court, on behalf of the Interstate Commerce Commission, as *amicus curiæ.*

*Mr. Clifford Hilton,* Attorney General of the State of Minnesota, and *Mr. Henry C. Flannery,* by leave of court, filed a brief as *amici curiæ.*

*Mr. Forney Johnston,* by leave of court, filed a brief as *amicus curiæ.*

*Mr. Karl Knox Gartner* and *Mr. William Lemke,* Attorney General of the State of North Dakota, by leave of court, filed a brief as *amici curiæ.*

MR. CHIEF JUSTICE TAFT, after stating the case, delivered the opinion of the court.

The Commission's order, interference with which was enjoined by the District Court, effects the removal of the unjust discrimination found to exist against persons in interstate commerce, and against interstate commerce, by fixing a minimum for intrastate passenger fares in Wisconsin at 3.6 cents per mile per passenger. This is done under paragraph 4 of § 13 of the Interstate Commerce Act, as amended by the Transportation Act of 1920, which authorizes the Interstate Commerce Commission, after a prescribed investigation, to remove

" Any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable,

or unjust discrimination against interstate or foreign commerce. "

We have two questions to decide.

First. Do the intrastate passenger fares work undue prejudice against persons in interstate commerce, such as to justify a horizontal increase of them all?

Second. Are these intrastate fares an undue discrimination against interstate commerce as a whole which it is the duty of the Commission to remove?

We shall consider these in their order.

First. The report and findings of the Commission undoubtedly show that the intrastate fares work an undue discrimination against travellers in interstate commerce and against localities (*Houston, East & West Texas Ry. Co.* v. *United States,* 234 U. S. 342) in typical instances numerous enough to justify a general finding against a large class of fares. In a general order thus supported, possible injustice can be avoided by a saving clause allowing any one to except himself from the order by proper showing. This practice is fully sustained by precedent in what was done as a sequence of the *Shreveport Case* (*Houston, East & West Texas Ry. Co.* v. *United States, supra*). See 34 I. C. C. 472; 41 I. C. C. 83; *Eastern Texas R. R. Co.* v. *Railroad Commission,* 242 Fed. 300; *Looney* v. *Eastern Texas R. R. Co.,* 247 U. S. 214. In *Illinois Central R. R. Co.* v. *State Public Utilities Commission,* 245 U. S. 493, 508, this court indicated its approval of such practice which was adopted by the Commission. 49 I. C. C. 713. Any rule which would require specific proof of discrimination as to each fare or rate and its effect would completely block the remedial purpose of the statute.

The order in this case, however, is much wider than the orders made in the proceedings following the *Shreveport* and *Illinois Central Cases.* There, as here, the report of the Commission showed discrimination against persons

and localities at border points, and the orders were extended to include all rates or fares from all points in the State to border points. But this order is not so restricted. It includes fares between all interior points although neither may be near the border and the fares between them may not work a discrimination against interstate travellers at all. Nothing in the precedents cited justifies an order affecting all rates of a general description when it is clear that this would include many rates not within the proper class or the reason of the order. In such a case, the saving clause by which exceptions are permitted, can not give the order validity. As said by this court in the *Illinois Central R. R. Case*, " it is obvious that an order of a subordinate agency, such as the Commission, should not be given precedence over a state rate statute otherwise valid, unless, and except so far as, it conforms to a high standard of certainty. " See also *American Express Co. v. Caldwell*, 244 U. S. 617, 627.

If, in view of the changes, made by federal authority, in a large class of discriminating state rates, it is necessary from a state point of view to change non-discriminating state rates to harmonize with them, only the state authorities can produce such harmony. We can not sustain the sweep of the order in this case on the showing of discriminations against persons or places alone.

Second. The report of the Commission shows that if the intrastate passenger fares in Wisconsin are to be limited by the statute of that State to 2 cents per mile, and charges for extra baggage and sleeping car accommodations are to be reduced in a corresponding degree, the net income of the interstate carriers of the State will be cut six millions of dollars below what it would be under intrastate rates on the same level with interstate rates. Under paragraphs 3 and 4 of § 13 and § 15a as enacted in §§ 416 and 422 respectively of the Transportation Act

of 1920 (which are given in part in the margin[1]), are such reduction and disparity an " undue, unreasonable, or unjust discrimination against interstate or foreign commerce " which the Interstate Commerce Commission may remove by raising the intrastate fares?  A short reference to the circumstances inducing the legislation and a summary of its relevant provisions will aid the answer to this question.

---

[1]Paragraphs 3 and 4 of § 13 of § 416 and § 15a of § 422 of the same act are as follows:

"(3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding.  The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this Act with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this Act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes *any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful,* it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter

The Interstate Commerce Act of 1887, 24 St. 379, was enacted by Congress to prevent interstate railroad carriers from charging unreasonable rates and from unjustly discriminating between persons and localities. The railroads availed themselves of the weakness and cumbrous machinery of the original law to defeat its purpose, and this led to various amendments culminating in the amending Act of 1910, 36. Stat. 539, in which the authority of the Commission in dealing with the carriers was made summary and effectively complete. Whatever the causes, the fact was that the carrying capacity of the railroads did not thereafter develop proportionately with the growth of the country, and it became difficult for them

to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

Section 422 of the Transportation Act, 1920, 41 Stat. 488.

The Interstate Commerce Act is further amended by inserting after section 15 a new section to be known as section 15a and to read as follows:

"Sec. 15a. (1)  . . . .

"(2) In the exercise of its power to prescribe just and reasonable rates, the Commission shall initiate, modify, establish or adjust such rates so that carriers as a whole (or as a whole in each of such rate groups or territories as the Commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating income equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation:  . . .

"(3) The Commission shall from time to time determine and make public what percentage of such aggregate property value constitutes a fair return thereon, and such percentage shall be uniform for all rate groups or territories which may be designated by the Commission. In making such determination it shall give due con-

to secure additional investment of capital on feasible terms.   When the extraordinary demand for transportation arose in 1917, the Congress and the President concluded to take over all the railroads into the management of the Federal Government, and by joint use of facilities, which the Anti-Trust Law was thought to forbid under private management, and by use of Government credit, to increase their effectiveness.   This was done by appropriate legislation and executive action under the war power.   From January 1, 1918, until March 1, 1920, when the Transportation Act went into effect, the common carriers by steam railroad of the country were operated by the Federal Government.   Due to the rapid rise in the

---

sideration, among other things, to the transportation needs of the country and the necessity (under honest, efficient and economical management of existing transportation facilities) of enlarging such facilities in order to provide the people of the United States with adequate transportation: *Provided,* That during the two years beginning March 1, 1920, the Commission shall take as such fair return a sum equal to 5½ per centum of such aggregate value, but may, in its discretion, add thereto a sum not exceeding one-half of one per centum of such aggregate value to make provision in whole or in part for improvements, betterments or equipment, which, according to the accounting system prescribed by the Commission, are chargeable to capital account.

"(4) For the purposes of this section, such aggregate value of the property of the carriers shall be determined by the Commission from time to time and as often as may be necessary.   The Commission may utilize the results of its investigation under section 19a of this Act, in so far as deemed by it available, and shall give due consideration to all the elements of value recognized by the law of the land for rate-making purposes, and shall give to the property investment account of the carriers only that consideration which under such law it is entitled to in establishing values for rate-making purposes. Whenever pursuant to section 19a of this Act, the value of the railway property of any carrier held for and used in the service of transportation has been finally ascertained, the value so ascertained shall be deemed by the Commission to be the value thereof for the purpose of determining such aggregate value."

prices of material and labor in 1918 and 1919, the expense of their operation had enormously increased by the time it was proposed to return the railroads to their owners. The owners insisted that their properties could not be turned back to them by the Government for useful operation without provision to aid them to meet a situation in which they were likely to face a demoralizing lack of credit and income. Congress acquiesced in this view. The Transportation Act of 1920 was the result. It was adopted after elaborate investigations by the Interstate Commerce Committees of the two Houses.

Under Title II it made provision for the termination of federal control March 1, 1920, for the refunding of the carriers' indebtedness to the United States, and for a guaranty for six months to the carriers of an income equal to the war-time rental for their properties, and directed that, for two years following the termination of federal control, the Secretary of the Treasury, upon certificate of the Commission, might make loans to the carriers not exceeding the maximum amount recommended in the certificate, out of a revolving fund of $300,000,000.

Under Title IV, amendments were made to the Interstate Commerce Act which included § 13, paragraphs 3 and 4, and § 15a, already quoted in the margin. The former for the first time authorizes the Commission to deal directly with intrastate rates where they are unduly discriminating against interstate commerce—a power already indirectly exercised as to persons and localities, with approval of this court in the *Shreveport* and other cases. The latter, the most novel and most important feature of the act, requires the Commission so to prescribe rates as to enable the carriers as a whole, or in groups selected by the Commission, to earn an aggregate annual net railway operating income equal to a fair return on the aggregate value of the railway property used in transportation. For two years, the return is to be

5½ per cent., with ½ per cent. for improvements, and thereafter is to be fixed by the Commission.

The act sought to avoid excessive incomes accruing, under the operation of § 15a, to the carriers better circumstanced, by using the excess for loans to the others and for other purposes. The act further put under the control of the Interstate Commerce Commission, 1st, the issuing of future railroad securities by the interstate carriers; 2nd, the regulation of their car supply and distribution and the joint use of terminals; and, 3rd, their construction of new lines, and their abandonment of old lines. The validity of some of these provisions has been questioned. Upon that we express no opinion. We only refer to them to show the scope of the congressional purpose in the act.

It is manifest from this very condensed recital that the act made a new departure. Theretofore the control which Congress through the Interstate Commerce Commission exercised was primarily for the purpose of preventing injustice by unreasonable or discriminatory rates against persons and localities, and the only provisions of the law that inured to the benefit of the carriers were the requirement that the rates should be reasonable in the sense of furnishing an adequate compensation for the particular service rendered and the abolition of rebates. The new measure imposed an affirmative duty on the Interstate Commerce Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. This is expressly declared in § 15a to be one of the purposes of the bill.

Intrastate rates and the income from them must play a most important part in maintaining an adequate national railway system. Twenty per cent. of the gross freight receipts of the railroads of the country are from intrastate traffic, and fifty per cent. of the passenger receipts. The ratio of the gross intrastate revenue to the

interstate revenue is a little less than one to three. If the rates,.on which such receipts are based, are to be fixed at a substantially lower level than in interstate traffic, the share which the intrastate traffic will contribute will be proportionately less. If the railways are to earn a fixed net percentage of income, the lower the intrastate rates, the higher the interstate rates may have to be. The effective operation of the act will reasonably and justly require that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system. Section 15a confers no power on the Commission to deal with intrastate rates. What is done under that section is to be done by the Commission " in the exercise of its power to prescribe just and reasonable rates ", i. e., powers derived from previous amendments to the Interstate Commerce Act, which have never been construed or used to embrace the prescribing of intrastate rates. When we turn to paragraph 4, § 13, however, and find the Commission for the first time vested with a direct power to remove " any undue, unreasonable, or unjust discrimination against interstate or foreign commerce ", it is impossible to escape the dovetail relation between that provision and the purpose of § 15a. If that purpose is interfered with by a disparity of intrastate rates, the Commission is authorized to end the disparity by directly removing it, because it is plainly an " undue, unreasonable, or unjust discrimination against interstate or foreign commerce ", within the ordinary meaning of those words.

Counsel for appellants, not able to satisfy their meaning by the suggestion of any other discrimination to which they apply, are forced to the position that the words are tautological and a mere repetition of " any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand," which precede them. In view of their apt appli-

cation to the most important purpose of the legislation, we are not at liberty to take such a view. If "undue, unreasonable, or.unjust discrimination against interstate or foreign commerce" are tautological, why are they followed by the phrase "which is hereby forbidden and declared to be unlawful?" To accompany a meaningless phrase with words of such special emphasis would be unusual.

It is urged that in previous decisions, notably the *Minnesota Rate Cases,* 230 U. S. 352, the *Shreveport Case, supra,* and the *Illinois Central Case, supra,* the expression "unjust discrimination against interstate commerce" was often used when, as the law then was, it could only mean discrimination as between persons and localities, and therefore that it is to be given the same limited meaning here. ·But, here, the general words are used after discrimination against persons and localities have been specifically mentioned. The natural inference is that even if they include what has gone before, they mean something more. When we find that they aptly include a kind of discrimination against interstate commerce which the operation of the new act for the first time makes important and which would seriously obstruct its chief purpose, we cannot ignore their necessary effect.

Counsel for appellants are driven by the logic of their position to maintain that the valuation required for the purposes of § 15a to be ascertained pursuant to § 19a of the Interstate Commerce.Act (37 Stat. 701; amended 41 Stat. 493), is to be only of that part of the property and equipment of the interstate carriers which is used in commerce among the States and must be segregated from that used in intrastate commerce. This is contrary to the construction which since the enactment of § 19a, March. 1, 1913, the Commission has put upon that section in carrying out its injunction. It is inadmissible. The language of § 15a refutes such interpretation. The per-

centage is to be calculated on " the aggregate value of the
railway property of such carriers held for and used in the
service of transportation." To impose on the Commis-
sion the duty of separating property used in the two serv-
ices when so much of it is used in both, and to do this
in a reasonably short time for practical use, as contem-
plated by the statute, would be to assign it a well-nigh
impossible task. This, of itself, prevents our giving the
words such a construction unless they clearly require it.
They certainly do not.

It is objected here, as it was in the *Shreveport Case,*
that orders of the Commission which raise the intrastate
rates to a level of the interstate structure violate the
specific proviso of the original Interstate Commerce Act
repeated in the amending acts, that the Commission is not
to regulate traffic wholly within a State. To this, the same
answer must be made as was made in the *Shreveport Case*
(234 U. S. 342, 358), that such orders as to intrastate
traffic are merely incidental to the regulation of interstate
commerce and necessary to its efficiency. Effective con-
trol of the one must embrace some control over the other
in view of the blending of both in actual operation. The
same rails and the same cars carry both. The same men
conduct them. Commerce is a unit and does not regard
state lines, and while, under the Constitution, interstate
and intrastate commerce are ordinarily subject to regula-
tion by different sovereignties, yet when they are so
mingled together that the supreme authority, the Nation,
cannot exercise complete effective control over interstate
commerce without incidental regulation of intrastate
commerce, such incidental regulation is not an invasion
of state authority or a violation of the proviso.

Great stress is put on the legislative history of the
Transportation Act to show that the bill was not intended
to confer on the Commission power to remove any dis-
crimination against interstate commerce involved in a

general disparity between interstate and intrastate rates. Committee reports and explanatory statements of members in charge made in presenting a bill for passage have been held to be a legitimate aid to the interpretation of a statute where its language is doubtful or obscure. *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 475. But when taking the act as a whole, the effect of the language used is clear to the court, extraneous aid like this can not control the interpretation. *Pennsylvania R. R. Co.* v. *International Coal Mining Co.*, 230 U. S. 184, 198. *Caminetti* v. *United States*, 242 U. S. 470, 490. Such aids are only admissible to solve doubt and not to create it. For the reasons given, we have no doubt in this case.

Counsel for the appellants have not contested the constitutional validity of the statute construed as we have construed it, although the counsel for the state commissions whom we permitted to file briefs as *amici curiae* have done so. The principles laid down by this court in the *Minnesota Rate Cases*, 230 U. S. 352, 432, 433, the *Shreveport Case*, 234 U. S. 342, 351, and the *Illinois Central Case*, 245 U. S. 493, 506, which are rates cases, and in the analogous cases of *Baltimore & Ohio R. R. Co.* v. *Interstate Commerce Commission*, 221 U. S. 612, 618; *Southern Ry. Co.* v. *United States*, 222 U. S. 20, 26, 27; *Second Employers' Liability Cases*, 223 U. S. 1, 48, 51, we think, leave no room for discussion on this point. Congress in its control of its interstate commerce system is seeking in the Transportation Act to make the system adequate to the needs of the country by securing for it a reasonable compensatory return for all the work it does. The States are seeking to use that same system for intrastate traffic. That entails large duties and expenditures on the interstate commerce system which may burden it unless compensation is received for the intrastate business reasonably proportionate to that for the

interstate business. Congress as the dominant controller of interstate commerce may, therefore, restrain undue limitation of the earning power of the interstate commerce system in doing state work. The affirmative power of Congress in developing interstate commerce agencies is clear. *Wilson* v. *Shaw*, 204 U. S. 24; *Luxton* v. *North River Bridge Co.*, 153 U. S. 525; *California* v. *Central Pacific R. R. Co.*, 127 U. S. 1, 39. In such development, it can impose any reasonable condition on a State's use of interstate carriers for intrastate commerce it deems necessary or desirable. This is because of the supremacy of the national power in this field.

In *Minnesota Rate Cases*, 230 U. S. 352, where relevant cases were carefully reviewed, it was said, p. 399: " The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

It is said that our conclusion gives the Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce. Action of the Interstate Commerce Commission in this regard should be directed to substantial disparity which operates as a real discrimination.

against, and obstruction to, interstate commerce, and must leave appropriate discretion to the state authorities to deal with intrastate rates as between themselves on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce.

It may well turn out that the effect of a general order in increasing all rates, like the one at bar, will, in particular localities, reduce income instead of increasing it, by discouraging patronage. Such cases would be within the saving clause of the order herein, and make proper an application to the Interstate Commerce Commission for appropriate exception. So, too, in practice, when the state commissions shall recognize their obligation to maintain a proportionate and equitable share of the income of the carriers from intrastate rates, conference between the Interstate Commerce Commission and the state commissions may dispense with the necessity for any rigid federal order as to the intrastate rates, and leave to the state commissions power to deal with them and increase them or reduce them in their discretion.

The order of the District Court granting the interlocutory injunction is

*Affirmed.*