## Cohn & Lewis v. United States (No. 4071) [1]

United States Court of Customs and Patent Appeals, November 22, 1937

Puckhafer & Rode (*John R. Rafter* of counsel) for appellant.

*Joseph P. Tumulty, Black, Varian & Simon* (*John Walsh, Alfred W. Varian,* and *Herbert M. Simon* of counsel), *amici curiae* and on behalf of various importers.

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks* and *Joseph F. Donohue*, special attorneys, of counsel), for the United States.

*Lamb & Lerch* (*J. G. Lerch* of counsel) *amici curiae* and on behalf of the United States.

[Oral argument October 13, 1937, by Mr. Rafter, Mr. Walsh, Mr. Folks, and Mr. J. G. Lerch]

Before Graham, Presiding Judge, and Bland, Hatfield, Garrett, and Lenroot, Associate Judges

Per Curiam: [2]

The appellant imported certain woolen hat shapes at the port of New York under the Tariff Act of 1930, which the collector classified

---

[1] T. D. 49335.

[2] The opinion in this case was prepared by the late Presiding Judge Graham and adopted by the court after his death.

as "wool felt wearing apparel," under paragraph 1115 (b) of said act. The importer protested, claiming the goods to be dutiable under paragraph 1114 (d) as outerwear and articles wholly or in chief value of wool, or, alternatively, as clothing and articles of wearing apparel, wholly or in chief value of wool, under paragraph 1115 (a), or as pile fabrics, finished or unfinished, in chief value of wool, under paragraph 1110, or as felts, not woven, in chief value of wool, under paragraph 1112, or as manufactures in chief value of wool under paragraph 1120 of said act.

On the hearing before the United States Customs Court, the importer relied upon the claim that the merchandise was dutiable under paragraph 1115 (a), at 33 cents per pound and 45 per centum ad valorem.

Said paragraph 1115 is as follows:

PAR. 1115. (a) Clothing and articles of wearing apparel of every description, not knit or crocheted, manufactured wholly or in part, wholly or in chief value of wool, valued at not more than $4 per pound, 33 cents per pound and 45 per centum ad valorem; valued at more than $4 per pound, 50 cents per pound and 50 per centum ad valorem.

(b) Bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt, 40 cents per pound and 75 per centum ad valorem; and, in addition thereto, on all the foregoing, if pulled, stamped, blocked, or trimmed (including finished hats, bonnets, caps, berets, and similar articles), 25 cents per article.

The parties stipulated the records in No. 3731, *Henry Pollak, Inc.* v. *United States*, 19 C. C. P. A. (Customs) 215, T. D. 46324, and *Henry Pollak, Inc.* v. *United States*, 22 C. C. P. A. (Customs) 81, T. D. 47066, into the record, and it was further stipulated that the merchandise in both the cited cases was the same in all material respects as the merchandise here involved.

It was also stipulated by the parties that the merchandise covered by the protest in this case "consists of wool felt in the form of bodies for hats, valued at not more than $4 per pound."

After the submission on stipulation, the Government made a motion to restore the cause to the calendar for the purpose of taking further testimony, and this motion was allowed. Thereupon six witnesses were called and testified on behalf of the Government.

There was a division of opinion among the judges of the First Division of the United States Customs Court, which heard the case. Presiding Judge McClelland was of opinion that the protest of the importer should be overruled. In his separate opinion he held that he would be inclined to agree with the importer that the material of which the imported merchandise was composed had never been wool felt, as a separate entity, and that, therefore, the imported goods were not bodies and shapes manufactured in whole or in part of wool felt under paragraph 1115 (b), were he not constrained to hold other-

wise in view of the legislative history of the particular provision which, in his view of the matter, made it necessary to hold that the congressional intent plainly was to the contrary. Judge Sullivan agreed with Judge McClelland that the protest should be overruled. He, however, thought the statutory language was unambiguous and no recourse should be had to' legislative history for construction. Judge Brown dissented, and was of opinion that the protest should be sustained under paragraph 1115 (a).

Judgment was accordingly entered overruling the protest and the importer has appealed.

From the incorporated records, and from the testimony, including samples and photographs in this case, we are able to get a good understanding of the method of manufacture of the imported articles. The facts as hereinafter stated are largely established by the testimony of William S. Rowe, Jr., a witness for the Government. The basic material is wool and noils mixed. This wool mixture is first put into a mattress carding machine which combs and cleans the mixture and causes it to issue in the form of a wool mattress. It is then put into a second carding machine which throws off a thin veil of wool which is wound around wooden blocks, and which is called "the carded form of wool." As the web comes out of the second carding machine, it is evenly laid over a double cone-shaped form, from which, when completed, the hat forms may be taken by cutting the double cone form or bat in the middle. From the time of the second process forward, the hat form constantly goes through successive processes. The next step is a hardening process, or what is called the first felting operation. The next operation is a shrinking operation, shrinking and tightening the fibers. After that the material is shrunk and tightened by a bumping operation. The next operation is a dyeing process. Then follows another bumping operation which shrinks the hat form and tightens it. The next operation is a final tightening operation.' Following this is an operation by which the tip of the hat form is stretched. The next process is a process of pulling the form onto a wooden block to give it shape. Finally, the form is dried and it is then shaved or pounded and is ready for its final use as a hat body.

In the first case covered by the stipulation and involving the same material that is here imported, that is, *Henry Pollak (Inc.)* v. *United States*, 19 C. C. P. A. (Customs) 215, T. D. 46324, the classification was under paragraph 1115 of the Tariff Act of 1922, as clothing and articles of wearing apparel in chief value of wool. In an extensive record in that case, an effort was made to establish that the goods were properly classifiable under paragraph 1119 as manufactures not specially provided for, wholly or in chief value of wool. The testimony established that the felt material was used for hats, but was used also for trimming, hand bags, and various other articles. The court below

was of the opinion that the goods were properly classified, and that the use for other purposes than hats was fugitive, and we affirmed the decision.

The second case referred to, *Henry Pollak, Inc.* v. *United States*, 22 C. C. P. A. (Customs) 81, T. D. 47066, involved the same material and the same competing paragraphs of the Tariff Act of 1922 as the first. This case was practically a retrial of the first case, and the same conclusion was reached.

As we view the matter, there is but one new feature to be considered here, and this is largely a question of law. The Congress, in rewriting paragraph 1115 in the Tariff Act of 1930, divided the same, adding subparagraph (b), which seems to have been enacted for the purpose of taking care of hats and like articles which had not been theretofore specifically mentioned, but which had caused considerable litigation. In writing this subparagraph, this language was used: "Bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt."

It is claimed by the Government here that the goods are properly classifiable under said subparagraph (b), which view was concurred in by a majority of the United States Customs Court. On the other hand, the importer claims that because of the language of said subparagraph (b) they cannot be included therein, but must be relegated to paragraph 1115 (a). The reason urged by the appellant is that under a long line of decisions by this court and the United States Customs Court, the language "manufactured wholly or in part of wool felt" must be construed to mean that there must have been felt before the hat bodies were manufactured, and if there was no felt as an independent entity, and the manufacture of the hats or hat forms and the felt proceeded simultaneously, then the bodies and shapes, etc., were not manufactured wholly or in part of wool felt.

The testimony in this case on the part of the Government is an attempt to show that the forms and shapes were, in fact, manufactured from wool felt. The Government claims that this testimony, taken at its full value, shows that the felt of which the forms were made appeared in the processing at the second stage; that after the wool had been wound upon the wooden cones as the first stage, at the next stage, namely, the first felting process, and thereafter, the material was wool felt, and that the hat form from and after the second stage was being made out of wool felt. Thus, Government counsel argue that even if it be admitted that there must be first felt before the hat forms are brought into existence, the testimony shows that this is true in the instant case.

It is quite plain, from an examination of the authorities, that the law is as has been urged herein by the appellant. A glance at some of these authorities will be in order.

*Burlington Venetian Blind Co.* v. *United States*, 1 Ct. Cust. Appls. 374, T. D. 31456, is the first of the so-called ladder tape cases. In that case the articles involved were so-called ladder tapes, made of cotton as entireties on looms, and used in the manufacture of venetian blinds. Although the question did not seem to have been directly raised, this court intimated very strongly that the objects before it might not properly be held to be manufactures of tapes previously manufactured.

This ladder tape question arose again in *United States* v. *Burlington Venetian Blind Co.*, 3 Ct. Cust. Appls. 378, T. D. 32967. Here the merchandise is described as two strips of woven fabric, united at regular intervals by means of other much lighter woven strips of fabric, and which are designed for the purpose of holding slats, and are used in the manufacture and repair of venetian blinds. It is said in the opinion that the object, when it comes from the loom, is completed except for the cutting of the small connecting threads. The conclusion of the court was that the article was not made of tapes or webs, as it had never assumed those independent forms, but that it had always been and was intended to be a ladder tape.

Another ladder tape case is *United States* v. *Walter et al.*, 4 Ct. Cust. Appls. 95, T. D. 33371. This case introduces the element of commercial designation, in which the court held contrary to the view of the importer.

*United States* v. *Macy & Co.*, 7 Ct. Cust. Appls. 8, T. D. 36256, involved certain lead and cotton clo-clo braids, the merchandise consisting of pieces of lead molded upon a flax cord, the whole being covered by tubular cotton braiding. It was contended that the material was dutiable as being in part of braids. The testimony showed that the articles were manufactured as a unit, and that the braid, as an entity, had never existed prior to its being found in the merchandise in issue and had never had a separate independent existence as an article or material. In view of this, this court was of opinion that the article was not made in whole or in part of braid.

*Western Blind & Screen Co.* v. *United States*, 9 Ct. Cust. Appls. 68, T. D. 39942, was another ladder tape case, in which we reached the same conclusion as stated in the above-cited ladder tape cases.

In *United States* v. *Dodge*, 13 Ct. Cust. Appls. 222, T. D. 41176, cotton rugs were involved. The question was whether they were properly classified as manufactures "made or cut from cotton pile fabrics," or carpets and rugs made wholly of cotton. The testimony showed that the rugs were woven on the loom to their final desired size, and that all that remained to be done as they came from the loom was to cut the selvage and sew it fast. The rug, as completed, had a pile. This court held that the rugs were not made from pile fabrics.

In *Angel & Co. (Inc.)* v. *United States*, 15 Ct. Cust. Appls. 19, T. D. 42132, certain extraction thimbles were classified as manufactures of paper. The merchandise was complete finished paper thimbles ready for use. It was claimed that the articles were manufactures of pulp. The entity of paper had never existed until these thimbles were made as a completely finished article. We held that they were manufactures of pulp.

One of our decisions on this interesting subject is *Curtis & Von Bernuth Mfg. Co.* v. *United States*, 22 C. C. P. A. (Customs) 651, T. D. 47633. Certain steamer rugs were here involved in chief value of wool not exceeding three yards in length. They were classified as blankets and similar articles "made of blanketing." The testimony showed that the articles were woven in lengths of about 50 or 60 yards, and they were so woven that after a length of 72 inches had been reached, the weft threads were automatically omitted so that the piece might be removed and the process continued. The question at issue was whether the involved articles were made of blanketing. This court held that inasmuch as blanketing had never existed in this case as a separate entity, it followed that the imported articles were not made of blanketing, but were blankets or robes, as the case might be.

The principle of the foregoing decisions was followed by us in two recent cases: *Swedish Venetian Blinds Co.* v. *United States*, 24 C. C. P. A. (Customs) 20, T. D. 48291, *Elmer T. Middleton* v. *United States,* 25 C. C. P. A. (Customs) 155, T. D. 49265.

In addition to the authorities cited, there are many applicable authorities in the reports of the United States Customs Court which it will not be necessary to refer to here, but which are in point and are fully digested and noted in the briefs.

From these citations it is apparent that from the first session of this court it has been a uniform and well-settled holding that the language "made of" or "manufactured of" presupposes that the material of which the article is made or manufactured exists before the article itself comes into existence.

It was the opinion of Presiding Judge McClelland that the trial court should follow the line of cases to which we have heretofore referred, were it not for what he regarded as contrary legislative intent, and cited the decision of this court in *United States* v. *Clay Adams Co., Inc.*, 20 C. C. P. A. (Customs) 285, T. D. 46078, where it was said: "All rules of construction must yield if the legislative intent is shown to be counter to the apparent intent indicated by such rule. The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent." Proceeding upon this theory, the presiding judge was of opinion that the congressional proceedings, including the report of the Ways and Means Committee, were such

as to lead to the conclusion that the Congress was intending to include hat forms, such as those involved here, within said paragraph 1115 (b), when the act of 1930 was drawn.

The law stated in the *Clay Adams* case, *supra*, and as quoted by the presiding judge, is the law as we understand it. However, it will be observed that the statement is that all rules of construction must yield if there be a contrary congressional intent shown. However, we must still retain in mind the law which is basic, as we view it, that if the language of a statute be plain and unambiguous, the law should be followed as written and it speaks for itself. Where it has so spoken plainly, no need of rules of construction is present, and hence recourse to the proceedings of the Congress and the committee having this legislation in charge, is unnecessary.

We are unable to discern any ambiguity in the language which the Congress used here. It used language which has been passed upon by this court for twenty-five years, and of which the Congress must have been fully conversant. It was language which was known to the profession and in the business world, and no difficulty need be had in understanding it.

In this view of the situation, if this material had never had a separate entity as wool felt, then there is no difficulty in the answer to the question presented. The Government contends that the testimony shows that from the second operation forward, the manufacture of these hat bodies was from wool felt. The testimony shows, however, that from the very initiation of the process of winding wool upon the hat forms, the process was one of hat form making. As the form advanced toward its final condition, the felting process continued and it was never until the last process that the material so processed became felt.

The court is of opinion that wool felt did not exist as an entity until the completion of these hat forms, and hence that the hat forms before us were not "manufactured wholly or in part of wool felt," under the facts and authorities.

The judgment of the United States Customs Court is *reversed* and the cause *remanded* for further proceedings.

### CONCURRING OPINION

BLAND, Judge: It is with considerable reluctance that I feel compelled to agree with the conclusion reached by this court in reversing and remanding the judgment of the trial court. This action results in a regrettable anomaly. After studying carefully the legislative history, I do not have the slightest doubt that when Congress framed subdivision (b) of paragraph 1115, it intended to include therein the particular kind of merchandise here involved.

Courts have frequently said that the intent of the law was the law and that the master rule of construction was to so construe statutory language that it reflected the intent of the legislature. Of course, there are limitations to this rule. Some language must be found in the statute that calls for construction before its plain meaning can be ignored. *United States* v. *Stone & Downer Co.*, 274 U. S. 225. Phrases like that here involved have been so frequently construed by this and other courts that their meaning and effect is clear—no ambiguity exists. It is well settled that we cannot go to the legislative history of a statutory provision to produce ambiguity. *Railroad Commission of Wisconsin et al.* v. *Chicago, Burlington & Quincy Railroad Company*, 257 U. S. 563, 589. If any force is to be given to this line of cases, I know of no place where it fits better than in the decision of the issue at bar. When Congress wrote the provision it knew of the long line of holdings by this court which requires a conclusion that there must have existed a preexisting wool felt before the hat bodies could be classified under the disputed paragraph. Notwithstanding this fact, Congress deliberately used the phrase "manufactured wholly or in part of wool felt."

I am inclined to believe that the Supreme Court of the United States, as presently constituted, might take a different view of this case, but to do so it would have to ignore the decisions cited and discussed herein by the late Presiding Judge Graham. Since the opinion delivered by Chief Justice Taft in *United States* v. *Stone & Downer Co.*, 274 U. S. 225, there has been a growing tendency of the courts of this country generally, including the Supreme Court, to liberalize the rule as to what you may consult and what extrinsic facts you may consider in an effort to arrive at the intent of Congress.