(C. D. 1403)

PERRY RYER & Co. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided April 3, 1952)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh* and
*Joseph E. Weil*, special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiff imported a mechanical device known as a McCorquodale machine deriving its name from the English manufacturer and covered by letters patent 2,302,096 (exhibit 1) granted by the United States. It is described on the consular invoice as "One Press for applying pigments to sheet material."

The collector of customs classified the importation as printing machinery and assessed duty thereon at the rate of 25 per centum ad valorem as provided in paragraph 372 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 372) which reads so far as applicable here as follows: "* * * printing machinery (except for textiles) * * * 25 per centum ad valorem * * *."

Plaintiff relies solely on the claim that the apparatus above described is neither printing machinery nor a printing machine and that its proper classification should be within the provision for "machines, finished or unfinished, not specially provided for," and dutiable at 15 per centum ad valorem in accordance with the terms of paragraph 372, *supra*, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The following exhibits were introduced by plaintiff:

Illustrative exhibit A—photograph of the imported machine.

Exhibit 1—copy of the letters patent granted by the United States covering the machine in issue.

Illustrative exhibit B—one of the individual tanks which is contained within the large tank marked "A" on illustrative exhibit A.

Illustrative exhibit C—the tubing, valve, and matrix through which the lacquer or pigment flows from the tank.

Illustrative exhibit D—color card or catalog sheet representing the colors of lipstick and nail polish. The colors but not the printed matter appearing thereon were made by the machine in controversy.

Illustrative exhibit E—color card or sheet representing color work done by said machine.

Illustrative exhibit F—color card which illustrates work done by the so-called chipping process.

Illustrative exhibit G—printed lithograph sheet representing the form in which it appears before any work has been performed by the McCorquodale machine. On the inside of the sheet various color spaces are identified by name and number, where the colors are to be inserted by said machine.

Illustrative exhibit H—represents illustrative exhibit G after the color work has been performed by said machine.

Illustrative exhibit I—leaflet illustrating color work performed by said machine.

Illustrative exhibit L—sheet illustrating the McCorquodale color spots.

Illustrative exhibit Q—business card of plaintiff's attorney which was received in evidence to illustrate work done by the intaglio process.

Defendant's exhibits consist of the following:

Exhibit N—color card produced on the McCorquodale machine.

Illustrative exhibit R—photograph of the Reinke printing press, a machine which does not employ ink.

Each side introduced the testimony of two witnesses. Plaintiff's witness, V. R. Vincent, who, as a result of many years' experience at various kinds of printing, was well qualified on the subject, testified that he was plant manager of the Cleveland division of Magill-Weinsheimer Co., the consignee of the imported machine; that the principal business of that company at Chicago was job printing and of the Cleveland division, the production of color cards. He was one of the first persons in the United States to use the McCorquodale machine, and with the use of illustrative exhibit A, which is a photograph of said machine, he described its operation, pointing out that a large tank marked "A" in the photograph is equipped with about 77 separate containers of individual colors. To quote the witness:

The material is contained—the material of a lacquer nature is contained in these individual containers. It flows down from the containers through flexible tubing through valves which control the shutoff of the tubing, marked "B"—the valves are not shown here—down through the matrix, marked "C." The material flows through the matrix and the function of the matrix is to confine the material in a predetermined area so that when the matrix is in contact with the sheet the material flows through the matrix and can flow no further than the confines of the well. Then the matrix—or before that the valves are closed so that no more paint can flow through the matrix—then the matrix leaves contact from the paper.

The witness testified that the McCorquodale machine does not utilize printing ink but, instead, a specially prepared lacquer stored in compartments similar to illustrative exhibit B which flows through flexible tubing and continues down through a valve and the matrix represented by illustrative exhibit C.

In explaining the method by which color spots are produced on a sheet of paper in commercial practice, the witness testified:

Well, as your lacquer flows through the flexible tubing, through the valve, the matrix. Let's say that the lacquer has already come down through the valve. The matrix comes in contact with a sheet of paper. It forms a seal. It is firmly down on that sheet of paper. At that time a mechanism in the press causes the valve stem to raise, which opens the small orifice in the valve. At that time it allows the lacquer to flow down through the valve on to the paper. The walls of the well on the under side of the matrix confine the flow of the lacquer so that it doesn't spread. It confines it to a predetermined area. Then, at a fraction of a second, synchronized through the operation of the machine, the valve closes and the matrix breaks contact from the paper and you have the McCorquodale deposited spot.

It further appears from the testimony of this witness that the lacquer flows directly through the tubes, valves, and the matrix onto the paper, and the color spot is deposited as a wet film one one-hundredth inch in thickness, and then the sheet of paper is carried away mechanically. He also testified that the lacquer is not transferred from the matrix to the paper, stating:

* * * The sole function of the matrix is only to confine the flow. It is not, in the language of printing, it is not transferred like from a plate to the paper. It is merely flowed directly on to the paper and the matrix confines the flow of the material.

The evidence further discloses that while the coloring material might flow down through the tubes by the force of gravity alone the process would be too slow, and in order to expedite the operation and speed up production, compressed air is employed; the size and shape of the color spots are determined by the size and shape of the raised areas surrounding the recesses on the bottom of the matrix, as will be seen by an examination of illustrative exhibit C, which confine the flow of the lacquer when the matrix is in contact with the paper; the raised area in the nature of a small frame around the edges of the recesses in the matrix is the only metal which touches the paper; that an arrangement of springs within the matrix causes six plungers at the bottom of the matrix to function at predetermined intervals in such a manner as to insure that the matrix will break away from the paper without sticking to the lacquer and permit the paper to be removed in order to receive another sheet.

The witness referred to a catalog sheet—illustrative exhibit D—depicting various colors of lipstick and nail polish produced by the McCorquodale machine and explained that the only portion of the sheet produced by the McCorquodale machine consisted of the spots simulating nail polish and lipstick. The remainder of the sheet comprises printed matter which was produced in the Chicago plant. Illustrative exhibit E is a color card on which the printing was done in Chicago and the colors deposited in Cleveland by the McCorquodale machine.

It was brought out by this witness that prior to the introduction of the McCorquodale process, color cards were produced by what is referred to as the "chipping" process, which consists principally in the pasting of colored slips (chips) of paper on cards or sheets, as shown by illustrative exhibit F. The efficiency and economy achieved by the McCorquodale process over the "chipping" process is demonstrated by the fact that whereas the "chipping" process produces 500 cards per day of the type represented by illustrative exhibit E, and 1,500 per day of the kind represented by illustrative exhibit F, the McCorquodale process can produce 1,200 per hour. The "chipping" process was described by the witness Vincent as follows:

Well, they proceeded to match their colors and spray or roller coat the color on to a sized sheet of paper. That paper then was cut up to the desired sizes of the chips that were to be mounted on the card. Then, they have a couple of methods. One was a hand chipping method where the girls merely put glue on the back of the chip and pasted it on. The other was what they call a semi-automatic chipping machine, the "Urie" and the "White," and they fill a till box, a small box with many compartments, with these different sized chips that they have cut up that are to be pasted on the sheet. They have a cover arrangement whereby they put the blank printed matter up on top and down in the bottom here is a tank with glue and they have small, little—what would you call them—blocks that would come up through the glue and put glue on to the sheet of paper in the relative positions of the colour chips. At that time the sheet would come down— it is a hand operation—the little blocks would go against the sheet; it would move over to another position where a girl would operate a pedal which would force these colour chips to come up against the paper and come in contact, the reverse side of the chips in contact with the glued areas on the printed material, and that is the way they do it by the chipping method.

The witness identified illustrative exhibit G as a sheet of paper upon which some printing had been produced by lithography or the "offset printing" method. Illustrative exhibit H was identified as the same sheet (illustrative exhibit G) after colors had been deposited by the McCorquodale machine.

Plaintiff's second witness Victor De Troy, also well qualified as one having intimate knowledge of the technology of printing, testified that he was the president of the De Troy Press, Inc., which operates a McCorquodale machine at its plant in Englewood, N. J.; that he has been in the printing business for about 31 years and during that time has "done about every type of printing that is normally printed in the printing industry"; that the three chief types of commercial printing are letterpress printing, lithography, and rotogravure. He described the operation of the McCorquodale machine substantially as given by the witness Vincent. He also testified that "The McCorquodale machine can only deposit the color spot as you have seen in Exhibit L, the printing has to be done on a printing machine. The McCorquodale machine cannot print."

To quote futher:

Q. And, what determines the shape of the spot which is to appear on the paper?—A. It would be that little frame of metal in this case, which is the rectangle. Without that, it would spread all over the sheet.

This statement of the witness may be visualized by an inspection of illustrative exhibit C.

The physical characteristics, operation, and nature of the work performed by the machine in controversy, as explained by the witnesses Vincent and De Troy, are not contradicted. The problem which confronts us is whether as matter of law this patented contrivance is within the scope and meaning of the words "printing machinery" appearing in paragraph 372, as modified, *supra*.

: An analysis of the evidence of defendant's witnesses will be considered, *infra*.

There is no question of commercial designation as distinguished from the common meaning of the statutory term "printing machinery," and we therefore proceed with the presumption that the common and commercial meanings are the same. In giving to the term its common meaning we are, of course, at liberty to consult lexicographic authorities as aids to the memory and understanding of the court in determining the proper application of the words "printing machinery."

In this connection, it will prove instructive to examine the following definitions of the words "print" and "printing" as they appear in Webster's New International Dictionary (2d edition) and Funk & Wagnalls Dictionary (1941):

*Webster's New International Dictionary*:

**print,** *v.* 1. To fix or impress as a stamp, mark, character, idea, etc., into or upon something or someone. 2. To stamp something in or upon, as with a seal or dye; to make an impression or mark upon by pressure, or as by pressure. 3. To press so as to make an imprint. 4. To make by or as by pressing or stamping. 5. Specif., to strike off an impression or impressions of, from type, or from stereotype, electrotype, or engraved plates, or the like; in a wider sense, to do the typesetting, presswork, etc., of (a book, edition, etc.); as, to *print* books, newspapers, pictures; also, to cause this to be done; to publish in print; as, to *print* the disclosures. 6. To stamp or impress with characters, figures, patterns, or the like, transferred by pressure from plates, types, or the like; as, to *print* cards; also, to transfer an impression of;—often with *on*; as, to *print* a design on calico. 7. to form in characters like those of type (other than script); as, a letter *printed* by a child. * * *

*Funk & Wagnalls Dictionary*:

। **print,** *v.* I. *t.* 1. To make a mark or marks upon, as by pressure; impress. * * * 2. *Print.* (1) To impress (matter arranged for reproduction, as type, plates, and the like) on paper, cloth, etc., as by inking the surface and subjecting to pressure, thus securing a reverse impression; as, to *print* an engraving. It has been held by courts in the United States that impressions made on paper with a typewriter are *written*, not *printed*. (2) To make copies of by means of a printing-press; as, 500 circulars were *printed*. 3. To put in print, or cause to be put in print or issued from the press; carry or send forth in print; publish; as, the newspaper *printed* the story. 4. To reproduce by sun-printing, mimeograph, electric pen, carbon-paper, or other transfer process; as, to *print* photographs; to *print* carbon copies. 5. To mark by pressing with a form or stamp; imprint; as, to *print* butter; specif., in founding, to make an impression of in a mold with a core-print or with a pattern. 6. To fix as by impressing; imprint, in a figurative sense; as, he *printed* a kiss upon her lips; the scene is *printed* in my memory. 7. To impress or mark as if by printing or stamping; delineate; as, his character is *printed* in his face. 8. To form in imitation of the characters used in print, in distinction from the cursive or written style; as, the child *printed* a letter. 9. To place on record; write.

*Webster's New International Dictionary*:

**printing,** *n.* 1. Act, art, or practice of impressing letters, characters, or figures on paper, cloth, or other material; the business of a printer, including typesetting and presswork, with their adjuncts; typography. Printing from

engraved wooden blocks was practiced by the Chinese as early as the 8th century A. D.; in the 13th century the initial letters in certain manuscripts were stamped from similar blocks. But the invention of typography in Europe practically began with the use of movable metal types by Johannes Gutenberg at Strasbourg and Mainz, 1438–45. Lourens Janszoon Coster, of Haarlem, is said to have printed from metal types at about the same time as Gutenberg. See PRINTING PRESS. 2. *Photog.* Act or art of producing a positive photographic picture from a negative on sensitized paper; act or art of making photographic prints. See PRINT, *v. t.* 8. 3. *Ceramics.* Act or art of decorating pottery by means of transfer papers printed with mineral colors or of gelatin sheets printed in oil. The colors are fixed by firing. 4. Amount printed at one time. 5. *pl.* Paper used for printing on.

*Funk & Wagnalls Dictionary:*

printing, *n.* 1. The art or trade of making and issuing matter for reading; by means of type and the printing-press, including all that is done from the reception of manuscripts to the issuing of matter printed; the process of making books, newspapers, magazines, etc. * * * 2. The process of producing printed matter by the inking of type, plates, etc., and impressing them upon paper or the like, as in a printing-machine; presswork; as, the plates are cast, but the *printing* is yet to be done. 3. The act or process of reproducing a design upon a surface, as by making an impression from it on a suitable substance by any process; as, lithographic *printing;* photographic *printing* by the action of sunlight on sensitized paper; the *printing* of pottery by means of transfer-paper or oil-colors, which are fixed by heat, etc.; *printing* for the blind by letters in relief. 4. That which is printed. * * * 5. *pl.* Paper used for printing purposes.

These definitions at once suggest that the words "print" and "printing" connote the act of stamping, impressing, or transferring letters, characters, or figures by pressure from a die, plate, type, or other device. In the case before us, the McCorquodale machine deposits color spots by the mere flowage of coloring material from a superimposed tank through tubes, valves, and a matrix to the surface upon which the color is to be fixed. While it is true that the flowage of coloring material is accelerated and facilitated by air pressure to increase quantity production, it is not believed that this operation can properly be regarded as falling within the scope and meaning of the words "to fix or impress, as a stamp, mark, character, idea, etc.," or in any proper sense responding to the fair, natural, and reasonable interpretation of the words "print" and "printing."

When the witness Vincent was asked to state his reasons why the McCorquodale machine is not a printing machine, he testified:

Well, for one, through most, in fact, all printing equipment that I am familiar with you have a definite transfer of color through ink fountains, ink distribution rollers, down to a plate or plate cylinder and it is transferred to the sheet of paper under pressure, high pressures. Also, through the offset process the ink is transferred to the plate that has the type matter, engraving, etc. on it. That in turn is transferred to a blanket, a rubber blanket; from the rubber blanket it is transferred to the sheet of paper under high pressures. In all cases of the printing business ink distribution rollers and compression cylinders are used. Here, we are applying a material.

The witness Vincent in distinguishing color printing from the work performed by the McCorquodale machine gave the following testimony:

Color printing is, well, let's see, for example if you were to take a kodachrome and you wanted to print the particular kodachrome you have got a negative there that you have to break up into dots. It is continuous tone. You can't print from a continuous tone plate so it is broken up; it is photographed through the photo composing machine through a screen which breaks up the entire photograph into little tiny dots and that is done with color separation for all the four colors and litho artists work on the negative itself until they have the desired effect for each color, so that, for example, the red plate has enough red in; black is transferred through all the different colors and they have to remove certain amounts of the black screen so that when the final result is made you will have a picture that will look like the kodachrome. From there they make contact positive and the positive is put in a vacuum frame; it is put on the zinc plate and it is exposed—the zinc plate is sensitized—and it is exposed and the part that is to be printed is later etched out or washed away. When it is exposed through arc lamps it becomes insoluble in water and it is washed away. The parts that are to remain stay on the plate. The parts that are to be printed are washed away and it is etched into the plate. That is a very brief summary of plate making that goes on an offset press but from there the plate is put on the press and it is run in an acid resize, what they call it, so that the non-printing areas will not accept printing ink but they will accept water, and that is how they keep the printing ink from becoming smudgey or smeared all over the entire plate because it is maybe etched in only maybe a thousandth or two thousandths. Then it is mounted on the press and inked and there again your impression is transferred to a rubber blanket and the rubber blanket transfers the image to the paper under pressure.

* * * A. Only one color per unit is applied at a time.

Upon the question whether the McCorquodale process constitutes printing, we advert further to the testimony of plaintiff's witnesses.

Vincent was of the opinion that the McCorquodale machine cannot perform the work done by printing machinery and that there is no form of printing known to him that can deposit 77 colors on a sheet in one operation. He was further of the opinion that the McCorquodale machine is not a printing machine, stating that in printing there is a transfer of color or ink under pressure, whereas in the McCorquodale process we are "applying a material directly to the paper; no transfers involved; no impressions involved nor any cylinders involved. We use entirely different material than they do on any printing equipment. We put a deposit spot on. Well, it would be almost impossible to measure the thickness of a printed area. The dried film is approximately three to four thousandths thick, the wet film being approximately ten thousandths thick. We can simulate all different degrees of gloss, sheen, textiles, lipsticks—as you have seen—and various other finishes that printing can only simulate but we can show the exact finish."

This witness was clearly of the opinion that the work performed by the McCorquodale machine did not respond to the definitions to

which his attention was invited for the simple reason that it did none of the things expressly outlined in those definitions.

Plaintiff's witness De Troy expressed the opinion that the McCorquodale machine is not a printing machine because "it bears no relation whatsoever to a machine that we in the trade know as a printing press," and that the average printer is unable to operate the McCorquodale machine.

To quote further from this witness:

* * * In my opinion, a printing machine is a machine that reproduces type pages; writing pages; pictures and anything that you can interpret by the mind or eye. That is my accepted definition of a printing machine. Your McCorquodale, for instance, can only put down colors and it requires a printing machine to put a little caption under that and say "this is red," "this is blue" or "this is pink" to identify the colors. Now, there are a great many decorators' colors. You can take the color on the wall and you might call that green or some other decorator's color. The McCorquodale machine doesn't print anything. It just samples color. It deposits color on the paper, but it still requires a printing machine to tell you what the color is and tell you who made it. A McCorquodale machine cannot tell you that.

De Troy agreed with Vincent that the work performed by the McCorquodale machine did not come within the definitions of the word "print," above quoted from Webster's New International Dictionary, because the machine does not use type or stereotype or electrotype, and nothing is transferred or impressed. "It is merely the flow of the material from the tank to the paper," the speed of the flow being increased by means of compressed air. The coloring material "flows through the tubes through the matrix on to the paper. There is no transfer. There is no impression." On cross-examination, De Troy testified that the only thing that a McCorquodale machine has in common with a printing press is that it employs a feeder to feed the paper.

We shall now examine the testimony of the two witnesses offered by the defendant in an effort to establish the correctness of the collector's classification.

The first witness, Ernest Schmatolla, testified that he had been in the printing industry for many years and that in the company of counsel for the respective parties to this litigation, he visited the De Troy plant and observed the operation of the McCorquodale machine. It appears that this was his first acquaintance with that machine. He expressed the opinion that it "has all the characteristics of printing presses" and resembles intaglio printing; that the McCorquodale process is similar to the silk screen process.

On cross-examination, the witness explained the difference between a *printed* color card and the color card produced by the McCorquodale machine. To quote:

In the McCorquodale color card, you will be using the actual paints themselves fixed up for the purpose and the faithfulness of the color card would be

more accurate as compared if we matched printing inks to a color by using the printing process, because the process lay on thinner films of ink; on the other hand, if you used screen printing method you could do it the same as in the McCorquodale except in a long winded job, awkward job.

Defendant's second witness, Joseph P. Smith, manager of the Bureau of Methods and Equipment of the New York Employing Printers Association, a technical trade association in the graphic arts industry, testified that the nature of his work was in the "selection of the proper equipment and the proper utilization of the equipment; the advice to membership on that score."

It appears from the record that this witness was well acquainted with printing machinery equipment and had seen the McCorquodale machine in operation (apparently for the first time) about 2 weeks prior to the trial in this case. He expressed the opinion that the McCorquodale machine is a printing machine both "Because the product of the machine is printing and printing comes from a printing press. Now, there are any numbers of adaptations or improvements over the years. In the early days of—take a particular operation of silk screen, which is also a printing process. In the early days, silk screen was a matter of stencil and brush paint over the stencil and it was a very slow hand operation. Now, the machine has been perfected that actually produces in volume, produces about between 8 and 9 hundred impressions per hour. It is an advancement. The McCorquodale process is an advancement over the old silk screen process."

The witness was asked if he knew of any printing machine which accomplishes its purpose by merely depositing color on a card, to which he replied: "There is no other machine. It is a radical departure from the conventional method of printing." The attention of the witness was invited to the definition of the word "print" in Webster's New Collegiate Dictionary, 1949 edition, reading "To stamp something in or upon; to make an imprint on."

When asked if the McCorquodale machine did any of those things, the witness replied "It does not, but I don't recognize that as a graphic arts definition of printing."

Further definitions of "print" were read to the witness who frankly admitted that he did not fully subscribe to any of them. He admitted that the McCorquodale machine did not imprint anything.

The only case authorities upon the subject of printing to which our attention has been invited are referred to by plaintiff, namely, *Arthur* v. *Moller*, 97 U. S. 365, 24 L. ed. 1046, and *Lawrence* v. *Merritt*, 127 U. S. 113, 32 L. ed. 91. In the first of these two cases, the question before the Court was whether certain pictures printed from lithographic stones by successive impressions, each impression giving a different portion of the view and of a different color, properly fell within the statutory designation "printed matter." The Court in

its opinion pointed out that "It is not necessary, however, that the characters produced should be letters or numerals, or the result of types or stereotypes, or be reading matter, but the term 'print' or 'printing' includes the most of the forms of figures or characters or representations, colored or uncolored, that may be impressed on a yielding surface." The Court then quoted several definitions of the words "to print," "print," and "prints" from Webster's Dictionary, McElrath's Commercial Dictionary, Homans's Encyclopedia of Commerce, and McCulloch's Dictionary of Commerce which clearly indicate that printing implies taking an impression of; to stamp; to mark by pressure; to strike off an impression of from types, stereotype or engraved plates.

In the second case above cited, the Court was concerned with the question whether certain tissue paper used for making letterpress copies of letters or written matter should be classified as "printing paper." It was there claimed that the process of transferring the writing made upon sheets of the ordinary writing paper used for that purpose, by causing the ink with which it was written to soak or penetrate through one or more thicknesses of the kind of tissue paper there under consideration, was in fact printing, and the paper therefore was printing paper.

The Court observed: "We, however, think it is perfectly clear that this process is not printing, and that the use of this kind of paper, which is in controversy here, for that purpose, does not make it 'printing paper.'" However, the Court said: "The words of the statute, 'paper, sized or glued, suitable only for printing paper,' and 'printing, unsized, used for books and newspapers, exclusively,' evidently have reference to the various kinds of paper which are used for printing by means of type or plates, which make an impression only upon the face of the paper presented to them, and not to these kinds of tissue paper, so characterized on account of their thinness, used for the purpose of transferring writing by the penetration or soaking through of the liquid used therefor, so that the copy is read upon the side of the paper opposite to that presented to the original writing."

While the two authorities above discussed have only a remote factual likeness to the case at bar, nevertheless, the observations of the Court in those cases lend some support to the conclusion which we have reached herein.

Other contentions made by the parties in their briefs have received our consideration but they are not deemed of sufficient importance to analyze them here.

A careful review of the record satisfies us that the work performed by the McCorquodale machine is not what is commonly or popularly known as "printing," if that term be given a fair and reasonable interpretation. The fact that the flow of coloring material from the tanks

down through the tubes, valves, and matrix is accelerated by means of compressed air to speed up production does not disturb that conclusion.

Therefore, the claim of plaintiff that the importation is properly dutiable at 15 per centum ad valorem as a machine, not specially provided for, pursuant to the terms of paragraph 372 of the Tariff Act of 1930, as modified, *supra*, is sustained, and the decision of the collector of customs is reversed.

Judgment will be entered accordingly.