(C. D. 1822)

TRANS MARINE SHIPPING Co. / PRINTRADE MACHINERY CORP. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 15, 1956)

*Sharretts, Paley & Carter* (*Donald W. Paley* of counsel) for the plaintiffs.
*George Cochran Doub*, Assistant Attorney General (*Richard M. Kozinn* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: Certain "Soldan Bronzemaster" bronzing and dusting machines and parts thereof, imported from England, were classified by the collector of customs as printing machines and parts in paragraph 372 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 372), and duty was imposed thereon at the rate of 25 per centum ad valorem.

The claim relied upon by plaintiffs herein is that the importations in controversy should have been classified as machines, not specially provided for, and parts thereof, in said paragraph 372, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and subjected to duty at the rate of 15 per centum ad valorem.

The pertinent text of the competing provisions is here set forth:
Paragraph 372 of the Tariff Act of 1930—

* * * printing machinery (except for textiles), bookbinding machinery, and paper-box machinery, 25 per centum ad valorem; * * *.

Paragraph 372 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*—

| Tariff Act of 1930, para- graph | Description of Products | Rate of Duty |
|---|---|---|
| 372 | Machines, finished or unfinished, not specially provided for:<br> Machines for packaging pipe tobacco; machines for wrapping cigarette packages; machines for wrapping candy; and combination candy cutting and wrapping machines.<br> \* \* \* \* \* \* \*<br> Other \* \* \*_____ | <br> <br> <br> <br> <br>\* \* \*<br>15% ad val. |

This case is before the court for determination on a record consisting of the testimony of one witness who appeared on behalf of plaintiffs and one exhibit.

John H. Szel, president of the Printrade Machinery Corp., one of the plaintiffs herein, testified that his duties consisted of making arrangements for agencies and also selling in connection with the import and export business engaged in by his company, which included the sale of equipment for the graphic arts industry. His association with this type of business had continued since 1924. He stated that he was familiar with the Soldan Bronzemaster bronzing and dusting machines and "parts" and had seen the machines in operation, which he described as follows:

\* \* \* It is either linked up or it can be also operated independently of a printing press. If it is linked up then a conveyor goes into the so-called delivery, in other words, where the sheets are delivered from a printing press, the printed sheets. The printing press previously put some sizing on the paper. Then the conveyor transports that sheet with the sizing underneath the bronze duct. The bronze duct is a mechanism consisting of several rollers. There is bronze powder piled up on top of them and the rollers turn, and the distance between the rollers determines the amount of bronze that's falling down to the sheet. The conveyor belt then carries the sheet to the burnishers. The burnishers are bands that rotate and rub the bronze into the sizing. At the same time, they accomplish one thing. They smoothen out the bronze powder so that it lies entirely flat on the surface, which is important for the luster that is sought in this process. From the burnishers the sheet travels, still on the conveyor belt, or rather on the rubber blanket this time, to so-called polishing bands. The polishing bands are bands that rotate at very high speed and have the tendency to take the excess bronze which has not been rubbed into the sizing off the sheet, and just puts the excess of

bronze into the hollow of the machine. There suction, all the time suction is trying to get the bronze down to a filter, a bag, a filter bag. And the bronze, the excess bronzes collected there can be used over again. Now, when all this is done the sheet then comes out, still on the conveyor belt, over the delivery of the bronzing machine.

An advertising circular was received in evidence as plaintiffs' exhibit 1, solely for the purpose of showing the results of the bronzing operation and not "in connection with any of the printed matter contained thereon."

It was orally stipulated by counsel for the parties that "the involved machine itself does not print."

Witness Szel stated that the bronzing machine does not accomplish the same result as printing machinery. When asked to distinguish the difference between the machines in controversy and printing machinery, he said, "A printing press is designed to make reproductions of an image carrier."

On cross-examination, the witness' attention was directed to his description of the bronzing machine in issue, wherein he had mentioned the fact that the paper was sized, in order to have the bronze adhere to it, and, when asked as to the nature of the sizing, he stated, "The sizing is actually a kind of varnish which is printed on the sheet in the printing press, either letter press or offset or any other process." The printing machine, itself, deposits the varnish or sizing and, at times, ink is used as a sizing.

It was the testimony of witness Szel that there also is a metallic ink used on printing presses which gives a metallic effect, but does not have the luster and brilliancy of bronze. He stated that bronzing machines and printing machines cannot be used interchangeably to produce the same result.

When asked, on cross-examination, whether or not he would say that the bronzing machines in issue, as well as bronzing machines in general, are used more often in conjunction with printing presses or without them, the witness replied, "More often in conjunction with printing presses" and reiterated his testimony that, when the bronzing machines are used separately from the presses themselves, the presses deposit the sizing on the paper.

Szel testified that the Soldan Bronzemaster is patented in England, but he did not know whether it was patented in the United States.

Referring to exhibit 1, the witness stated that, except for the page he had marked with the figure "2," the printing is done before the bronzing operation, but that, on page 2, the printing followed the bronzing process. An article like exhibit 1 is produced by being printed on one printing press for the black lettering and illustrations, on the same printing press or another one for the sizing, and then the

bronzing machine applies the bronze. In other words, everything appearing in black on exhibit 1, the illustrations as well as the printed matter, was printed on a printing press. Szel said that, so far as his experience and knowledge go, the imported machine is used exclusively for bronzing.

Defendant, in its brief, contends that the imported merchandise is printing machinery or a part of printing machinery, even in the light of its concession that the articles in and of themselves do not print. It is pointed out that, whereas in the Tariff Act of 1922, paragraph 372 provided for printing presses, not specially provided for, but did not contain a provision for printing machinery, paragraph 372 of the current act provides for "printing machinery (except for textiles)," but not *eo nomine* for printing presses. From that premise, it is evidently the defendant's deduction that the change in language connotes a change in meaning. After a reference to the Tariff Readjustment, 1928, Hearings, Committee on Ways and Means, 70th Congress, 2d session, volume 3, pages 2491–2495, and Tariff Readjustment, 1929, Hearings, Committee on Finance, United States Senate, 71st Congress, 1st session, volume 3, pages 946–958, and, particularly, the testimony or statements before the Committee on Finance of the United States Senate, appearing at pages 947, 948, 953, and 954, defendant, in its brief, states:

A consideration of the above clearly discloses that in the enactment of the provision of paragraph 372, Tariff Act of 1930, for "printing machinery (except for textiles)" Congress manifested a clear intent to include within the purview of the provision of paragraph 372, Tariff Act of 1930, for "printing machinery (except for textiles)" any machinery used in a printing establishment that plays any part in the production of a printed product. * * *

With such line of reasoning, the court is not in accord, in view of the expressions of our appellate court in the case of *United States* v. *Perry Ryer & Co.*, 41 C. C. P. A. (Customs) 18, C. A. D. 524. That court was there presented with the proper classification of a so-called "McCorquodale Machine." The machine in question deposited color spots by the mere flowage of coloring material from a superimposed tank through tubes, valves, and a matrix to the surface upon which the color was to be fixed and was used in the production of color cards. The McCorquodale process was invented to take the place of the prior existing "chipping" process, which consisted in pasting colored slips or chips of paper on cards or sheets.

The question in the *Perry Ryer* case, *supra*, as here, was whether the importation should properly be classified as printing machinery in paragraph 372 of the Tariff Act of 1930, as determined by the collector of customs, or as machines, finished or unfinished, not specially provided for, in said paragraph 372, as modified by the

General Agreement on Tariffs and Trade, as claimed by the importer. The appellate court, in affirming the decision of the court below, after giving consideration to the argument raised on appeal that, predicated upon the legislative history, the McCorquodale machine came within the purview of paragraph 372 for printing machinery, gave expression to the following remarks:

It is argued in effect that this change in language when taken in connection with certain testimony or statements before the Committee on Finance of the United States Senate when that Committee was considering the bill which matured into the Tariff Act of 1930, evidences a legislative intent "to include within the purview of the provisions of paragraph 372, Tariff Act of 1930, for 'printing machinery (except for textiles)' any machinery used in a printing establishment that plays any part in the production of a printed product."

\* \* \* \* \* \* \*

The representative did not receive what he asked for, as may be discerned by examining paragraph 372 \* \* \*, as it passed originally, and we are unable to discover any logical connection between his testimony and the change in the language of paragraph 372, but, even if such a connection be imagined, it is well to remember that Congress has never delegated to unofficial persons appearing before its committees advocating legislation, the authority to determine its intention. Only Courts have been clothed with authority in that respect and in construing a statute the courts themselves seek aid extrinsic of it only in cases where it is ambiguous. In the case of *Railroad Commission of Wisconsin et al.* v. *Chicago, Burlington, Quincy Railroad Co.*, 257 U. S. 563, 588–9, the Supreme Court declared that extraneous aids "are only admissible to solve doubt and not to create it." See also *United States* v. *Kung Chen Fur Corp.*, 38 C. C. P. A. (Customs) 107, C. A. D. 447, and cases therein cited.

The decision of the appellate court contains an enumeration of devices which were held judicially to be printing machines or printing machinery, but not printing presses, to wit, machines for printing numbers on certain articles, machines for printing on wooden lead pencils, machines for embossing and printing on leather, and machines for printing railroad tickets and registering their sale.

It was the opinion of the appellate court in the *Perry Ryer* case that—

It is our view that a device, to. fall within the classification of printing machinery, must print something. Nothing is printed on or by the McCorquodale machine. It deposits paint pigments on paper, cardboard, etc., primarily, as we understand it, to make cards for use in advertising and selling paint. For obvious reasons it tends to supplant prior methods of making such cards. Surely, the "chipping process" of making color cards hereinbefore described, and which presumably the machine here involved has supplanted to some extent, could not by any stretch of the imagination be regarded as a printing process, nor could a "chipping" machine be regarded as a printing machine, or as printing machinery.

The judgment of this court in *Perry Ryer & Co.* v. *United States* (28 Cust. Ct. 153, C. D. 1403), sustaining the claim of plaintiff that

the McCorquodale machine was within the provision in paragraph 372, as modified, *supra*, as "Machines, finished or unfinished, not specially provided for," was affirmed by the appellate court.

It will be observed that the contention of defendant in this case that the substitution of the provision "printing machinery (except for textiles)" in paragraph 372 of the Tariff Act of 1930 for the provision "printing presses," appearing in the same paragraph of the Tariff Act of 1922, manifests a clear intent "to include within the purview of the provision of paragraph 372, Tariff Act of 1930, for 'printing machinery (except for textiles)' any machinery used in a printing establishment that plays any part in the production of a printed product" was presented verbatim when the *Perry Ryer* case, *supra*, was on appeal to the Court of Customs and Patent Appeals. Inasmuch as the appellate court, after careful consideration of that argument, ruled *contra* to the defendant's contention, we take like action here on this phase of the case.

Moreover, as referred to, *supra*, it was the holding of the appellate court in the *Perry Ryer* case that for a device to fall within the classification of printing machinery, it must print something. Early in the proceedings in the case before us, counsel for the parties orally stipulated and agreed that the "Soldan Bronzemaster" bronzing and dusting machines do not print. Therefore, we come to the inevitable conclusion that the machines in controversy and their parts are not printing machinery and parts thereof in a tariff sense.

We think that the provision in paragraph 372, as modified, *supra*, for machines, finished or unfinished, not specially provided for, which are subject to duty at the rate of 15 per centum ad valorem (parts thereof being similarly provided for and dutiable), aptly describes the "Soldan Bronzemaster" machines and parts at bar and that the same are dutiable thereunder. We so hold. That claim in the protests is, therefore, sustained. The alternative claim of plaintiffs, having been abandoned, is dismissed.

Judgment will be entered accordingly.