United States *v.* Perry Ryer & Co. (No. 4743) [1]

20

United States Court of Customs and Patent Appeals, June 3, 1953

*Charles J. Wagner,* Acting Assistant Attorney General (*Richard H. Welsh,* special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument April 16, 1953, by Mr. Welsh and Mr. Schwartz]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

The Government here appeals from the judgment entered by the Second Division of the United States Customs Court in conformity with its decision, C. D. 1403, 28. Cust. Ct. 153, wherein the collector's classification of and duty assessment on the involved merchandise were held to be erroneous and the protest of the importer sustained.

The importation consists of a mechanical device described on the consular invoice as "One Press for applying pigments to sheet material." It consisted of an article covered by United States Patent No. 2,302,096, issued November 17, 1942, to one A. P. Battey, an English subject, which patent is shown to have been assigned to McCorquodale and Company, Limited, of London, England, the manufacturer of the imported machine which was consigned to the Magill-Weinsheimer Co., of Cleveland, Ohio, the actual party in interest here, appellee having served the company merely as broker. The patent, a copy of which is in evidence as appellee's exhibit 1, is entitled "Applying Pigments To Sheet Material," and the device is said to be known to the trade as a "McCorquodale Machine."

All of the claims of the patent are directed to an apparatus by means of which the pigments in lacquers or paints are applied to paper, cardboard, and the like, to make what are commonly called color cards, such, we understand, as the cards displayed in various channels of trade to enable those interested to compare, contrast, match, and study color effects generally to aid them in choosing lacquers and paints for various uses. Cards, or catalogs, displaying samples of lipstick pigments and samples of nail polish pigments were introduced in evidence in connection with the device here involved, the actual pigments having been applied to the paper by the device. However, the device is not limited to the application of those particular pigments. Obviously, it may be used for the application of all kinds of lacquers and paints, and others are shown on certain of the illustrative exhibits.

It is not questioned that the device is a machine classifiable under paragraph 372 of the Tariff Act of 1930 (19 U. S. C. Sec. 1001, par. 372) which paragraph covers an extensive variety of articles.[1]

[1] The full text of paragraph 372 as originally enacted reads:

Par. 372. Reciprocating steam engines and steam locomotives, 15 per centum ad valorem; sewing machines, not specially provided for, valued at not more than $75 each, 15 per centum ad valorem; valued at more than $75 each, 30 per centum ad valorem; steam turbines, 20 per centum ad valorem; cash registers, 25 per centum ad valorem; printing machinery (except for textiles), bookbinding machinery, and paper-box machinery, 25 per centum ad valorem; lawn mowers and machine tools, 30 per centum ad valorem; embroidery machines, including shuttles for sewing and embroidery machines, lace-making machines, machines for making lace curtains, nets and nettings, 30 per centum ad valorem; knitting, braiding, lace braiding, and insulating machines, and all other similar textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; all other textile machinery, finished or unfinished, not specially provided for, 40 per centum ad valorem; cream separators valued at more than $50 each, and other centrifugal machines for the separation of liquids or liquids and solids, not specially provided for, 25 per centum ad valorem; combined adding and typewriting machines, 30 per centum ad valorem; apparatus for the generation of acetylene gas from calcium carbide, 20 per centum ad valorem; machines for cutting or hobbing gears,

The question is what particular part of paragraph 372 is applicable.

The collector classified the device as printing machinery under the express provision in the paragraph reading:

* * * printing machinery (except for textiles) * * * 25 per centum ad valorem.

The claim of the importer, which the trial court sustained, is that the device is neither a printing machine nor printing machinery, but that it falls within the provision of the paragraph for "all other machines, finished or unfinished, not specially provided for," and is dutiable at the rate of only 15 per centum ad valorem due to the modifications [2] fixed by the General Agreement on Tariffs and Trade, set out in T. D. 51802, 82 Treas. Dec. 305, frequently referred to as the "Geneva Trade Agreement."

In the brief on behalf of appellant before us, the arguments in support of the collector's classifications are made under two headings or points.

It is contended, first, that "The evidence establishes that the involved device is 'printing machinery,' " and, second, that "Legislative history in conjunction with the evidence establishes that the involved device is within the purview of the provision of paragraph 372, *supra*, for printing machinery."

These contentions will be discussed in the order of their presentation.

While counsel for appellant challenge the conclusion at which the Customs Court arrived, based upon its findings of fact, the accuracy of the fact findings, as *per se* facts, is not challenged.

We have studied the evidence carefully and, in our opinion, the court's summation of the testimony and other evidence leaves nothing to be desired in that respect. A paraphrase of the summary would be less meritorious than the summary itself so we quote verbatim.

A list of the exhibits was first stated as follows:

Illustrative exhibit A—photograph of the imported machine.

Exhibit 1—copy of the letters patent granted by the United States covering the machine in issue.

Illustrative exhibit B—one of the individual tanks which is contained within the large tank marked "A" on illustrative exhibit A.

Illustrative exhibit C—the tubing, valve, and matrix through which the lacquer or pigment flows from the tank.

Illustrative exhibit D—color card or catalog sheet representing the colors of lipstick and nail polish. The colors but not the printed matter appearing thereon were made by the machine in controversy.

Illustrative exhibit E—color card or sheet representing color work done by said machine.

---

40 per centum ad valorem; punches, shears, and bar cutters, intended for use in fabricating structural or other rolled iron or steel shapes, 40 per centum ad valorem; all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem: * * *.

[2] The rate upon "other machines" fixed in the act as originally passed was 27½ per centum ad valorem. In the Geneva Agreement it was 15 per centum ad valorem.

Illustrative exhibit F—color card which illustrates work done by the so-called chipping process.

Illustrative exhibit G—printed lithographed sheet representing the form in which it appears before any work has been performed by the McCorquodale machine. On the inside of the sheet various color spaces are identified by name and number, where the colors are to be inserted by said machine.

Illustrative exhibit H—represents illustrative exhibit G after the color work has been performed by said machine.

Illustrative exhibit I—leaflet illustrating color work performed by said machine.

Illustrative exhibit L—sheet illustrating the McCorquodale color spots.

Illustrative exhibit Q—business card of plaintiff's attorney which was received in evidence to illustrate work done by the intaglio process.

## Defendant's exhibits consist of the following:

Exhibit N—color card produced on the McCorquodale machine.

Illustrative exhibit R—photograph of the Reinke printing press, a machine which does not employ ink.

Two witnesses were called on behalf of the importer and two on behalf of the Government. The testimony of those called on behalf of the importer was summarized as follows:

Plaintiff's witness, V. R. Vincent, who, as a result of many years' experience at various kinds of printing, was well qualified on the subject, testified that he was plant manager of the Cleveland division of Magill-Weinsheimer Co., the consignee of the imported machine; that the principal business of that company at Chicago was job printing and of the Cleveland division, the production of color cards. He was one of the first persons in the United States to use the McCorquodale machine, and with the use of illustrative exhibit A, which is a photograph of said machine, he described its operation, pointing out that a large tank marked "A" in the photograph is equipped with about 77 separate containers of individual colors. To quote the witness:

> The material is contained—the material of a lacquer nature is contained in these individual containers. It flows down from the containers through flexible tubing through valves which control the shutoff of the tubing, marked "B"—the valves are not shown here—down through the matrix, marked "C." The material flows through the matrix and the function of the matrix is to confine the material in a predetermined area so that when the matrix is in contact with the sheet the material flows through the matrix and can flow no further than the confines of the well. Then the matrix—or before that the valves are closed so that no more paint can flow through the matrix—then the matrix leaves contact from the paper.

The witness testified that the McCorquodale machine does not utilize printing ink but, instead, a specially prepared lacquer stored in compartments similar to illustrative exhibit B which flows through flexible tubing and continues down through a valve and the matrix represented by illustrative exhibit C.

In explaining the method by which color spots are produced on a sheet of paper in commercial practice, the witness testified:

> Well, as your lacquer flows through the flexible tubing, through the valve, the matrix. Let's say that the lacquer has already come down through the valve. The matrix comes in contact with a sheet of paper. It forms a seal. It is firmly down on that sheet of paper. At that time a mechanism in the press causes the valve stem to raise, which opens the small orifice in the valve. At that time it allows the lacquer to flow down th[r]ough the valve on to the paper. The walls of the well on the under side of the matrix confine the flow of the lacquer so that it doesn't spread. It confines it to a prede-

termined area. Then, at a fraction of a second, synchronized through the operation of the machine, the valve closes and the matrix breaks contact from the paper and you have the McCorquodale deposited spot.

It further appears from the testimony of this witness that the lacquer flows directly through the tubes, valves, and the matrix onto the paper, and the color spot is deposited as a wet film one one-hundredth inch in thickness, and then the sheet of paper is carried away mechanically. He also testified that the lacquer is not transferred from the matrix to the paper, stating:

> * * * The sole function of the matrix is only to confine the flow. It is not, in the language of printing, it is not transferred like from a plate to the paper. It is merely flowed directly on to the paper and the matrix confines the flow of the material.

The evidence further discloses that while the coloring material might flow down through the tubes by the force of gravity alone the process would be too slow, and in order to expedite the operation and speed up production, compressed air is employed; the size and shape of the color spots are determined by the size and shape of the raised areas surrounding the recesses on the bottom of the matrix, as will be seen by an examination of illustrative exhibit C, which confine the flow of the lacquer when the matrix is in contact with the paper; the raised area in the nature of a small frame around the edges of the recesses in the matrix is the only metal which touches the paper; that an arrangement of springs within the matrix causes six plungers at the bottom of the matrix to function at predetermined intervals in such a manner as to insure that the matrix will break away from the paper without sticking to the lacquer and permit the paper to be removed in order to receive another sheet.

The witness referred to a catalog sheet—illustrative exhibit D—depicting various colors of lipstick and nail polish produced by the McCorquodale machine and explained that the only portion of the sheet produced by the McCorquodale machine consisted of the spots simulating nail polish and lipstick. The remainder of the sheet comprises printed matter which was produced in the Chicago plant. Illustrative exhibit E is a color card on which the printing was done in Chicago and the colors deposited in Cleveland by the McCorquodale machine.

It was brought out by this witness that prior to the introduction of the McCorquodale process, color cards were produced by what is referred to as the "chipping" process, which consists principally in the pasting of colored slips (chips) of paper on cards or sheets as shown by illustrative exhibit F. The efficiency and economy achieved by the McCorquodale process over the "chipping" process is demonstrated by the fact that whereas the "chipping" process produces 500 cards per day of the type represented by illustrative exhibit E, and 1,500 per day of the kind represented by illustrative exhibit F, the McCorquodale process can produce 1,200 per hour. The "chipping" process was described by the witness Vincent as follows:

> Well, they proceeded to match their colors and spray or roller coat the color on to a sized sheet of paper. That paper then was cut up to the desired sizes of the chips that were to be mounted on the card. Then, they have a couple of methods. One was a hand chipping method where the girls merely put glue on the back of the chip and pasted it on. The other was what they call a semi-automatic chipping machine, the "Urie" and the "White," and they fill a till box, a small box with many compartments, with these different sized chips that they have cut up that are to be pasted on the sheet. They have a cover arrangement whereby they put the blank printed matter up on top and down in the bottom here is a tank with glue and they have small, little—what would you call them—blocks that would come up through the glue and put glue on to the sheet of paper in the relative positions of the colour chips. At that time the sheets would come down— it is a hand operation—the little blocks would go against the sheet; it would move over to another position where a girl would operate a pedal which

would force these colour chips to come up against the paper and come in contact, the reverse side of the chips in contact with the glued areas on the printed material, and that is the way they do it by the chipping method.

The witness identified illustrative exhibit G as a sheet of paper upon which some printing had been produced by lithography or the "offset printing" method. Illustrative exhibit H was identified as the same sheet (illustrative exhibit G) after colors had been deposited by the McCorquodale machine.

Plaintiff's second witness Victor DeTroy, also well qualified as one having intimate knowledge of the technology of printing, testified that he was the president of the DeTroy Press, Inc., which operates a McCorquodale machine at its plant in Englewood, N. J.; that he has been in the printing business for about 31 years and during that time has "done about every type of printing that is normally printed in the printing industry", that the three chief types of commercial printing are letterpress printing, lithography, and rotogravure. He described the operation of the McCorquodale machine substantially as given by the witness Vincent. He also testified that "The McCorquodale machine can only deposit the color spot as you have seen in Exhibit L, the printing has to be done on a printing machine. The McCorquodale machine cannot print."

To quote futher:

Q. And, what determines the shape of the spot which is to appear on the paper?—A. It would be that little frame of metal in this case, which is the rectangle. Without that, it would spread all over the sheet.

This statement of the witness may be visualized by an inspection of illustrative exhibit C.

The physical characteristics, operation, and nature of the work performed by the machine in controversy, as explained by the witnesses Vincent and DeTroy, are not contradicted. * * *.

Before summarizing the testimony of the two witnesses called on behalf of the Government, the court quoted definitions of "print" and "printing" from different dictionaries. In meaning, the definitions given by the respective lexicographers are, in all material respects, the same and we deem it sufficient to quote those which the court reproduced from Webster's New International Dictionary:

PRINT, *v.* 1. To fix or impress as a stamp, mark, character, idea, etc., into or upon something or someone. 2. To stamp something in or upon, as with a seal or dye; to make an impression or mark upon by pressure, or as by pressure. 3. To press so as to make an imprint. 4. To make by or as by pressing or stamping. 5. Specif., to strike off an impression or impressions of, from type, or from stereotype, electrotype, or engraved plates, or the like; in a wider sense, to do the typesetting, presswork, etc., of (a book, edition, etc.); as, to *print* books, newspapers, pictures; also, to cause this to be done; to publish in print; as, to *print* the disclosures. 6. To stamp or impress with characters, figures, patterns, or the like, transferred by pressure from plates, types, or the like; as. to *print* cards; also, to transfer an impression of;—often with *on*; as, to *print* a design on calico. 7. to form in characters like those of type (other than script); as, a letter *printed* by a child. * * *

PRINTING, *n.* 1. Act, art, or practice of impressing letters, characters, or figures on paper, cloth, or other material; the business of a printer, including typesetting and presswork, with their adjuncts; typography. Printing from engraved wooden blocks was practiced by the Chinese as early as the 8th century A. D.; in the 13th century the initial letters in certain manuscripts were stamped from similar blocks. But the invention of typography in Europe practically began with the use of movable metal types by Johannes Gutenberg at Strasbourg

and Mainz, 1438–45. Lourens Janszoon Coster of Haarlem, is said to have printed from metal types at about the same time as Gutenberg. See PRINTING PRESS. 2. *Photog.* Act or art of producing a positive photographic picture from a negative on sensitized paper; act or art of making photographic prints. See PRINT, *v. t.* 8. 3. *Ceramics.* Act or art of decorating pottery by means of transfer papers printed with mineral colors or of gelatin sheets printed in oil. The colors are fixed by firing. 4. Amount printed at one time. 5. *pl.* Paper used for printing on.

Both of the witnesses for the importer, evidently being considered experts in both the printing art and the art practiced on the involved machine, although not conceded to be experts in the printing art by counsel for the Government, were asked their opinion as to it being a printing machine and were requested to state their reasons for such opinion. Both were quite positive in the view that it was not such and their reasons were summarized in the court's decision as follows:

Vincent was of the opinion that the McCorquodale machine cannot perform the work done by printing machinery and that there is no form of printing known to him that can deposit 77 colors on a sheet in one operation. He was further of the opinion that the McCorquodale machine is not a printing machine, stating that in printing there is a transfer of color or ink under pressure, whereas in the McCorquodale process we are "applying a material directly to the paper; no transfers involved; no impressions involved nor any cylinders involved. We use entirely different material than they do on any printing equipment. We put a deposit spot on. Well, it would be almost impossible to measure the thickness of a printed area. The dried film is approximately three to four thousandths thick, the wet film being approximately ten thousandths thick. We can simulate all different degrees of gloss, sheen, textiles, lipsticks—as you have seen—and various other finishes that printing can only simulate but we can show the exact finish."

This witness was clearly of the opinion that the work performed by the McCorquodale machine did not respond to the definitions to which his attention was invited for the simple reason that it did none of the things expressly outlined in those definitions.

Plaintiff's witness DeTroy expressed the opinion that the McCorquodale machine is not a printing machine because "it bears no relation whatsoever to a machine that we in the trade know as a printing press," and that the average printer is unable to operate the McCorquodale machine.

To quote further from this witness:

* * * In my opinion, a printing machine is a machine that reproduces type pages; writing pages; pictures and anything that you can interpret by the mind or eye. That is my accepted definition of a printing machine. Your McCorquodale, for instance, can only put down colors and it requires a printing machine to put a little caption under that and say "this is red," "this is blue" or "this is pink" to identify the colors. Now, there are a great many decorators' colors. You can take the color on the wall and you might call that green or some other decorators' color. The McCorquodale machine doesn't print anything. It just samples color. It deposits color on the paper, but it still requires a printing machine to tell you what the color is and tell you who made it. A McCorquodale machine cannot tell you that.

DeTroy agreed with Vincent that the work performed by the McCorquodale machine did not come within the definitions of the word "print," above quoted from Webster's New International Dictionary, because the machine does not use type or stereotype or electrotype, and nothing is transferred or

impressed. "It is merely the flow of the material from the tank to the paper," the speed of the flow being increased by means of compressed air. The coloring material "flows through the tubes through the matrix on to the paper. There is no transfer. There is no impression." On cross-examination, DeTroy testified that the only thing that a McCorquodale machine has in common with a printing press is that it employs a feeder to feed the paper.

The following is the court's summarization of the testimony of the two witnesses called on behalf of the Government:

The first witness, Ernest Schmatolla, testified that he had been in the printing industry for many years and that in the company of counsel for the respective parties to this litigation, he visited the DeTroy plant and observed the operation of the McCorquodale machine. It appears that this was his first acquaintance with that machine. He expressed the opinion that it "has all the characteristics of printing presses" and resembles intaglio printing; that the McCorquodale process is similar to the silk screen process.

On cross-examination, the witness explained the difference between a *printed* color card and the color card produced by the McCorquodale machine. To quote:

In the McCorquodale color card, you will be using the actual paints themselves fixed up for the purpose and the faithfulness of the color card would be more accurate as compared if we matched printing inks to a color by using the printing process, because the process lay on thinner films of ink; on the other hand, if you used screen printing method you could do it the same as in the McCorquodale except in a long winded job, awkward job.

Defendant's second witness, Joseph P. Smith, manager of the Bureau of Methods and Equipment of the New York Employing Printers Association, a technical trade association in the graphic arts industry, testified that the nature of his work was in the "selection of the proper equipment and the proper utilization of the equipment; the advice to membership on that score."

It appears from the record that this witness was well acquainted with printing machinery equipment and had seen the McCorquodale machine in operation (apparently for the first time) about 2 weeks prior to the trial in this case. He expressed the opinion that the McCorquodale machine is a printing machine both "Because the product of the machine is printing and printing comes from a printing press. Now, there are any numbers of adaptations or improvements over the years. In the early days of—take a particular operation of silk screen, which is also a printing process. In the early days, silk screen was a matter of stencil and brush paint over the stencil and it was a very slow hand operation. Now, the machine has been perfected that actually produces in volume, produces about between 8 and 9 hundred impressions per hour. It is an advancement. The McCorquodale process is an advancement over the old silk screen process."

The witness was asked if he knew of any printing machine which accomplishes its purpose by merely depositing color on a card, to which he replied: "There is no other machine. It is a radical departure from the conventional method of printing." The attention of the witness was invited to the definition of the word "print" in Webster's New Collegiate Dictionary, 1949 edition, reading "To stamp something in or upon; to make an imprint on."

When asked if the McCorquodale machine did any of those things, the witness replied "It does not, but I don't recognize that as a graphic arts definition of printing."

Further definitions of "print" were read to the witness who frankly admitted that he did not fully subscribe to any of them. He admitted that the McCorquodale machine did not imprint anything.

In view of the arguments presented before us, it has occurred to us that as an aid in determining the nature and characteristics of the involved machine, it is proper to consider the patent which covers it, and we quote the following excerpts from it.

In the specification it is said:

This invention relates to an improved method of applying pigment to the surface of a number of sheets of paper, cardboard, fabric or the like singly in succession, utilising an intermittently operating, e. g. a reciprocating, sheet feed mechanism, and to apparatus for carrying out the improved method.

In applying pigment to a number of paper or other sheets singly in succession by the method according to the present invention, a sheet is fed by means of said mechanism to a position opposite a matrix having recesses in the face thereof, and the sheet is then clamped against the recessed face of said matrix and pigment applied to the surface of the sheet by leading the pigment under pressure from a suitable source through conduits leading through the matrix to the recesses in the face thereof, thereafter the sheet is parted from the matrix but retained in a horizontal position immediately beneath the matrix during further movement of the sheet feed mechanism. The sheet with the pigment applied being finally removed from beneath the matrix during a subsequent movement by the sheet feeding means for feeding the next succeeding sheet beneath the matrix.

It is a fundamental principle of patent law that "the claims measure the invention." *General Electric Co.* v. *Wabash Co.*, 304 U. S. 364, 369, citing *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.*, 210 U. S. 405, 419.

Claim No. 1 of the patent, introduced as an exhibit here, seems to be typical of the several apparatus claims. It reads:

1. Apparatus for applying pigment to the surface of a number of sheets of paper, cardboard, fabric or other sheet material singly in succession, comprising a matrix having recesses in the face thereof, intermittently operating sheet feeding mechanism adapted to feed sheets singly to a position opposite the face of said matrix, means to effect relative movement between said matrix and a sheet fed by said feeding mechanism first to bring said fed sheet into clamped surface contact with the face of said matrix and subsequently to release it therefrom, conduits leading pigment under pressure through said matrix to the recesses in the face thereof and on to the sheet, whilst the sheet is in the clamped position, and means for retaining the sheet in position vertically beneath said matrix after the sheet has been parted therefrom and during further movement of said sheet feeding mechanism and means whereby the sheet is moved from beneath said matrix during movement by the sheet feeding mechanism for feeding the next succeeding sheet to said position opposite the matrix.

The foregoing has been included by us merely to supplement the testimony of the witness as to the character of the device.

After the trial court discussed the testimony, it reviewed the decisions in the cases of *Arthur* v. *Moller*, 97 U. S. 365, and *Lawrence* v. *Merritt*, 127 U. S. 113, which had been cited before it, and said of them:

While the two authorities above discussed have only a remote factual likeness to the case at bar, nevertheless, the observations of the Court in those cases lend some support to the conclusion which we have reached herein.

The court's conclusion was expressed as follows:

A careful review of the record satisfies us that the work performed by the McCorquodale machine is not what is commonly or popularly known as "printing," if that term be given a fair and reasonable interpretation. The fact that the flow of coloring material from the tanks down through the tubes, valves, and matrix is accelerated by means of compressed air to speed up production does not disturb that conclusion.

Therefore, the claim of plaintiff that the importation is properly dutiable at 15 per centum ad valorem as a machine, not specially provided for, pursuant to the terms of paragraph 372 of the Tariff Act of 1930, as modified, *supra*, is sustained, and the decision of the collector of customs is reversed.

In the brief on behalf of the Government before us it is argued that a consideration of the testimony clearly discloses the following:

* * * (1) air pressure operating behind pigment forces the pigment or lacquer down through the tubes, valves and matrix on to the paper; (2) the air in the wells of the matrix *must* be displaced in order to make room for the lacquer or pigment, and (3) the air pressure behind the pigment or lacquer forces the air that is trapped in the wells of the matrix right through the sheet of paper. It is therefore clearly apparent that the air pressure does *much* more than accelerate the flow of the coloring matter. The air pressure behind the pigment must be and is strong enough to force the air trapped in the wells of the matrix right through the paper. In other words, the pressure must be gauged so that the air contained in each well is forced out and the pigment applied in the space of three seconds.

The air pressure does not lead the lacquer, or pigment. The pressure operating behind the pigment or lacquer forces the same down through the tubes, valves and matrix. It is the pigment or lacquer that hits the air contained in the wells with such force that the air is forced through the paper and the lacquer, or pigment, is then applied to the paper.

It seems to us that, conceding all the foregoing and conceding further the correctness of the testimony of the Government witnesses to the effect that it is the air pressure which renders the machine commercially practicable, any contention that these facts render the device a printing machine, as that term is commonly understood, is untenable.

It is our view that a device, to fall within the classification of printing machinery, must print something. Nothing is printed on or by the McCorquodale machine. It deposits paint pigments on paper, cardboard, etc., primarily, as we understand it, to make cards for use in advertising and selling paint. For obvious reasons it tends to supplant prior methods of making such cards. Surely, the "chipping process" of making color cards hereinbefore described, and which presumably the machine here involved has supplanted to some extent, could not by any stretch of the imagination be regarded as a printing process, nor could a "chipping" machine be regarded as a printing machine, or as printing machinery.

The brief of the Government points out that throughout the trial of the case the witnesses for the importer in testifying, and the trial

court, throughout its decision, used the term "deposit" with reference to the placing of the pigment on the paper, whereas the patent itself uses the terms "applying" and "applied."

It is said that "nowhere in the patent [appellee's exhibit 2 (it is in fact exhibit 1)], does the word 'deposit' appear," and that "A complete reading of appellee's exhibit 2 [1] discloses [that] whenever the operation of the machine is discussed it always refers to the pigment as *being applied by pressure* and *not deposited.*" (Italics quoted.)

It seems to us that when the machine *applies* the pigment it *deposits* the pigment, but whatever fine distinction may be attributed to the respective terms, merely *applying* pigment to paper, even though done by atmospheric pressure, does not convert the applying agency into printing machinery. We know of no printing machine which has atmospheric pressure as one of its features.

Incidentally, we are disposed to agree with the suggestion in the brief on behalf of the importer to the effect that the fact that the patent nowhere refers to the McCorquodale process as printing is more significant than its use of "applying" instead of "deposit" or "depositing."

It does not appear from the record before us that the subject matter of Point II in the brief on behalf of the Government was presented before the Customs Court.

As hereinbefore recited, the allegation of Point II is that "Legislative history in conjunction with the evidence establishes that the involved device is within the purview of the provision of paragraph 372, *supra*, for "printing machinery."

There is nothing in the decision of the Customs Court which gives the slightest indication that any reference to legislative history was made in the presentation before it. We have no doubt that the contention would have been fully discussed and ruled upon had it been presented.

It does appear in the record that a motion was filed on behalf of the Government for a rehearing based "upon the annexed Memorandum of Charles J. Wagner, Acting Assistant Attorney General, and upon all the papers and proceedings had herein," and appellant alleges that the trial court erred "In denying appellant's motion for a rehearing."

The record does not disclose what the "annexed Memorandum" contained, and, as has been indicated, there is nothing shown in the "papers and proceedings" which relates to legislative history. We find no error in the denial of the motion for rehearing.

It seems clear to us that counsel for the Government seek to have this court pass upon a matter not presented to the trial court. This is a practice not to be commended, but, in view of the particular situation existing and in order to expedite the litigation, our views will be expressed.

It is alleged on behalf of the Government that the court erred:

10. In not holding that the change in language in paragraph 372, Tariff Act of 1930, employing the term "printing machinery" in place of the term "printing presses" (as in paragraph 372, Act of 1922), showed a Congressional intent to include within that term "printing machinery" any machinery used in a printing establishment which plays a part in the production of a printed product.

It is pointed out that paragraph 372 of the Tariff Act of 1922 contained a provision for "printing presses" n. s. p. f., but none for printing machinery, while paragraph 372 of the 1930 Act contains a provision for "printing machinery (except for textiles) * * *," but no provision for printing presses.

It is argued in effect that this change in language when taken in connection with certain testimony or statements before the Committee on Finance of the United States Senate when that Committee was considering the bill which matured into the Tariff Act of 1930, evidences a legislative intent "to include within the purview of the provisions of paragraph 372, Tariff Act of 1930, for 'printing machinery (except for textiles)' any machinery used in a printing establishment that plays any part in the production of a printed product."

The testimony or statement thus relied upon is from Tariff Adjustment Hearings, 1929, Committee on Finance, United States Senate, 71st Cong., 1st Sess., Vol. 1, pages 947, 948, 953, and 954. The party testifying (he was under oath) stated that he was representing importers of printing and bookbinding machinery and he was asking a reduction to 15% in the duty rates (30%) fixed by the 1922 tariff act on "printing presses, printing machinery, not specially provided for and also bookbinding and box-making machinery.[3]

---

[3] The statements of the representative quoted in the Government's brief read:

1. Domestic production:

The figures, which you will find in Tariff Information, 1929, are only for printing presses, while I am giving the figures for printing machinery and also bookbinding and box-making machinery.

*Senator King: I find that in 1925 the domestic production was $36,034,478.*

Mr. Tilford: That is right; but I have different figures here, because I also added the printing machinery and bookbinders' machinery.

In 1921 the domestic production of *printing presses* alone—and I will leave out the last few figures; I will just give it in millions—amounted to $22,000,000. *Other printing machinery*, also bookbinders' and paper-box machinery, amounted to $9,400,000.

Senator King: What would you call that machinery?

Mr. Tilford: A printing press is just a press for printing.

Senator King. I know.

Mr. Tilford. A printing machine would be, say, a *paper cutter, wire stitcher, perforator, or different other machines* that have never been classified in this new list. (italics in the brief).

\*          \*          \*          \*          \*          \*          \*

Senator King: You want it put on the free list? Is that your recommendation?

Mr. Tilford: I can not insist on that.

Senator Reed: He asks for 15 per cent.

Mr. Tilford: I am asking for 15 per cent, but I just mentioned that to show that we are really entitled to be on the free list.

Senator Reed: You are thankful for anything.

Mr. Tilford: That is right.

I have also a third proposition here. That would be to leave the paragraph on printing presses as it is, at the rate which you find correct, 15 or 20 per cent, and then add another paragraph on which we really need protection, which will read: "*Printing machinery*, bookbinders and box-making machinery" at a rate of 10 or 15 per cent. (italics in the brief.)

The representative did not receive what he asked for, as may be discerned by examining paragraph 372 (quoted in a footnote, *supra*), as it passed originally, and we are unable to discover any logical connection between his testimony and the change in the language of paragraph 372, but, even if such a connection be imagined, it is well to remember that Congress has never delegated to unofficial persons appearing before its committees advocating legislation, the authority to determine its intention. Only Courts have been clothed with authority in that respect and in construing a statute the courts themselves seek aid extrinsic of it only in cases where it is ambiguous. In the case of *Railroad Commission of Wisconsin et al.* v. *Chicago, Burlington, Quincy Railroad Co.*, 257 U. S. 563, 588–9, the Supreme Court declared that extraneous aids "are only admissible to solve doubt and not to create it." See also *United States* v. *Kung Chen Fur Corp.*, 38 C. C. P. A. (Customs) 107, C. A. D. 447, and cases therein cited.

The term "printing machinery" undoubtedly is broader than the term "printing presses." The brief on behalf of the importer gives a number of illustrations of devices such as machines for printing numbers on certain articles, machines for printing on wooden lead pencils, machines for embossing and printing on leather and machines for printing railroad tickets and registering their sale, which were held judicially to be printing machines or printing machinery, but not printing presses.

In this connection, we direct attention to the decision of this court in the case of *United States* v. *Charles Bashwiner, Lunham & Reeve, Inc.*, 28 C. C. P. A. (Customs) 100, C. A. D. 131.

The device there involved seems to have been one used for the purpose of pasting together three layers of material "such as paper, leather, cardboard and other things." The laminated article had "not been specifically dedicated to any one particular purpose," but it could be used "as material for display cards, as backs for books or for making paper boxes."

There were three protests. In the first the importer claimed classification as "printers machines," in the second, as "printing or bookbinding machinery," and in the third as "printing machinery."

It was urged on behalf of importers that they were not required either to state in their protests or to show by proof whether the imported machines were printing machinery, book-binding machinery, or paper-box machinery since the three kinds of machines were named in the single quoted phrase and all were dutiable at the same rate— 25% ad valorem. There was, however, no claim that they were paper-box machinery.

It is not altogether clear just which classification the trial court deemed applicable. It sustained the protest, and we reversed the

judgment which it rendered, because we were of opinion that the device should be classified under the provision for "all other machines, finished or unfinished, not specially provided for." We thus sustained the construction which counsel then representing the Government placed upon the paragraph.

Upon the printing phase of the claims we said:

The machines have nothing whatever to do with the art of printing. The fact that they may be used in printing establishments where printed matter is pasted upon cardboard does not necessarily show that they are printing machinery.

Obviously, we did not then think, nor—it may be said—was it then contended on behalf of the Government that just "any machinery used in a printing establishment that plays any part in the production of a printed product" is included within the purview of the provision of paragraph 372, *supra*, for "printing machinery (except textiles) * * *."

It seems clear that the color applying machine here involved has nothing more to do with the art of printing than the pasting machines had in the *Bashwiner* case, *supra*.

The judgment of the Customs Court is *affirmed*.